[No. B077182. Second Dist., Div. Three. Oct. 29, 1996.]

COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, Plaintiff and Respondent, v.
AETNA CASUALTY AND SURETY COMPANY et al., Defendants and Respondents;
UNITED PACIFIC INSURANCE COMPANY, Defendant, Cross-complainant and Appellant;
SCOTTSDALE INSURANCE COMPANY, Cross-defendant and Respondent.

COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, Plaintiff, v.
GRANITE STATE INSURANCE COMPANY, Defendant.

TOKYO MARINE AND FIRE INSURANCE COMPANY, Plaintiff, v.
AETNA CASUALTY AND SURETY COMPANY, Defendant.

COUNSEL

Wasserman, Comden & Casselman, David B. Casselman and Glenn A. Brown, Jr., for Defendant, Cross-complainant and Appellant.

Cooksey, Howard, Martin & Toolen, Phil Woog and Thomas Zimmerman for Cross-defendant and Respondent.

No appearance for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

OPINION

CROSKEY, J.—In this action, which appears to be the final part of a major and complex construction defect case, we are called upon to construe the provisions of an excess liability policy which calls for the application of the horizontal exhaustion rule. The precise question presented is whether an excess insurer, under policy provisions such as those presented here, has any obligation, in a continuing loss case, to "drop down" and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted. Consistent with the horizontal exhaustion rule, we answer this question in the negative. We therefore affirm the judgment.

The appellant, United Pacific Insurance Company (United), seeks reversal of the trial court's declaratory judgment in favor of the respondent, Scottsdale Insurance Company (Scottsdale), in which the court held that Scottsdale, an excess insurer, had no duty to defend the common insureds and therefore had no obligation to contribute to the very substantial defense costs which United had expended in providing that defense.[1]

---

[1]This summary grossly oversimplifies the complicated legal proceedings which led to the judgment which is the subject of this appeal. However, it is sufficient for our purposes. The original litigation involved 27 separate lawsuits brought against a number of insureds to recover damages caused by serious construction defects on a number of high-density condominium and townhouse projects. After extensive litigation, a final global settlement was reached on December 14, 1990. Then, the instant litigation, consisting of three consolidated actions, began among the several insureds and their multiple insurers. One of the claims asserted in those proceedings was a cross-complaint by United against Scottsdale for declaratory relief and equitable contribution. After a lengthy bench trial, a judgment on all of the competing claims was issued. All such claims were then resolved in postjudgment agreements except for the last remaining dispute now before us.

## Factual and Procedural Background[2]

In the mid-1970's, developers, including the Community Redevelopment Agency of the City of Los Angeles (CRA), embarked upon a major redevelopment project for the Monterey Hills area of Los Angeles. The redevelopment area initially consisted of three hilly masses with slopes ranging from moderate to steep. The CRA undertook to determine the feasibility of developing the site for residential use. Under the plan adopted, the CRA was responsible for constructing public improvements, including, among other things, the cut, fill compaction, grading, installation of drainage devices, subdrainage systems and preparation of building pads. The improved parcels were then to be sold by CRA to a redeveloper for construction of low- and moderate-income housing units.

As part of the redevelopment, two major fills were created: Pullman Canyon and Lomitas Canyon. In some instances these fills were over 100 feet in depth. Commencing in the late 1970's and continuing until early 1984, the Carley Capital Group, J.D. Carley and/or Carley Pacific (collectively, Carley), as the redevelopers and general contractors, along with numerous subcontractors, designed and constructed a number of condominium, townhouse and apartment complexes in the redevelopment area. In early 1984, California Coast Development Group, Inc. (Cal Coast) succeeded to certain of the interests of J.D. Carley and Carley Pacific and engaged in the construction of two additional complexes. The construction of most of the complexes had been completed by September of 1983.

Prior to the construction of any structures in the redevelopment area, mass grading and filling was accomplished. The trial court found that this work was improperly done and concluded that the Lomitas and Pullman Canyon fills and the building pads were defective and damaged for the following reasons: (a) large quantities of colluvial material (unsuitable soil) were left at the bottom of said fills; (b) the fill was inadequately compacted; (c) portions of the subdrain system collapsed; (d) excessive moisture was retained in said fills; and (e) other improper materials were contained in said fills, (e.g., boulders, wood fragments, roots and other organic materials).

Based on these findings, the trial court concluded that the fills and the earthen pads, which were placed totally or partially on such fills, were defectively designed, engineered, constructed and inspected. Such defects

---

[2]There is no dispute as to the relevant facts; indeed, there were the subject of a written stipulation executed by the parties and filed with the court on February 26, 1992. We recite the facts as reflected in that stipulation and in the unchallenged findings of the trial court in order to provide context for the issue presented to us which is strictly one of law.

caused and, as of the date of trial, were continuing to cause the fills and pads to settle, which in turn resulted in continuing damages to the structures and improvements located thereon. The fills and building pads were initially damaged during the grading and construction process because the fills experienced an immediate excessive subsidence. To be more precise, the trial court concluded that the excessive settlement or subsidence commenced upon completion of the Lomitas Canyon and Pullman Canyon fills in April 1977 and has continued to the present day.

From this, the trial court drew the further conclusion that the damage to the fills and building pads, including the resulting damage to structures and improvements, was a *continuing loss* or damage that was generic to all of the complexes that were totally or partially constructed over said fills. Therefore, the court concluded, every cause of action alleged in the underlying actions which claimed excessive subsidence, damage to structures and improvements, damage to the fills or damage to the building pads located at the redevelopment area, potentially referred to this continuing loss or damage.

United had issued two successive comprehensive general liability (CGL) policies to Carley for the periods May 31, 1982, to May 31, 1983, and May 31, 1983, to May 31, 1984. A third policy was issued to Carley and Cal Coast for the period May 31, 1984, to May 31, 1985. Each of these United policies was primary insurance and was in the face amount of $1 million. There is no dispute that these policies provided coverage for the property damage claims asserted against Carley and Cal Coast in the underlying actions which were ultimately brought by the several homeowner associations and individuals who sued to recover for the extensive damages and losses sustained to their homes as a result of the above described subsidence.

In addition, Cal Coast had purchased another primary CGL policy with coverage for $1 million from State Farm Fire and Casualty Insurance Company (State Farm). The effective dates of coverage for this policy were June 15, 1985, to June 15, 1986. Finally, Cal Coast also purchased a $5 million umbrella policy from Scottsdale which was specifically (but not exclusively) excess to the State Farm policy. Scottsdale's policy was effective from July 19, 1985, through June 14, 1986. It not only covered Cal Coast, but also Carley and the CRA.

The relevant provisions of the Scottsdale policy[3] are as follows:

"DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS

---

[3]The single dispute in this case, whether Scottsdale had any duty to provide a defense to any of the insureds, will be resolved by a construction and application of this policy language.

"The company shall have the right and duty to defend any suit against the INSURED seeking damages which are payable under the above insuring Agreement, even if any of the allegations of the suit are groundless, false, or fraudulent, *provided, however, that no other insurance affording a defense or indemnity against such a suit is available to the INSURED*

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"UNDERLYING LIMIT – RETAINED LIMIT

"The Company shall be liable only for the ULTIMATE NET LOSS in excess of the greater of the INSURED'S: (A) Underlying Limit – An amount equal to the Limits of Liability indicated beside the underlying insurance listed in the Schedule of Underlying Insurance (Schedule A),[4] *plus the applicable limits of any other underlying insurance collectible by the INSURED;*

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"LIMITS OF LIABILITY

". . . In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of the payment of damages for PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING LIABILITY, which occur during each policy period, this policy, subject to the above limitations, shall:

"(A) in the event of reduction pay in excess of the reduced underlying limits, or

"(B) *in the event of exhaustion continue in force as underlying insurance subject to all the terms and conditions of such underlying insurances.*

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"OTHER INSURANCE: The insurance afforded by this policy shall be *excess* insurance *over any other valid and collectible insurance* available to the INSURED, *whether or not described in the Schedule of Underlying Insurance* . . . .

"ENDORSEMENT NO. 2

"Subsidence Exclusion

---

[4]Schedule A listed State Farm's $1 million policy as the underlying insurance.

"It is agreed that *this policy shall not apply to any liability* for Bodily Injury or Property Damage *caused by the subsidence* of land & arising out of or attributable to any operations of the insured." (Italics added.)

The extensive damages sustained by a number of individual homeowners and homeowner associations resulted, subsequent to 1984, in at least 27 separate damage actions (plus one unwritten and unfiled "claim") against Carley, Cal Coast and the CRA (as well as a number of other parties whose interests are not material to the instant matter). Not unexpectedly, a substantial amount of expensive litigation activity ensued. In February of 1988, State Farm negotiated a settlement, on behalf of Carley, of all of the claims asserted by the Drake Terrace Homeowner's Association (representing one of the damaged complexes). State Farm's contribution to this settlement was $1 million.[5] This exhausted State Farm's policy limits and serves as the basis for United's argument that Scottsdale had a resulting obligation to immediately drop down and provide primary coverage in State Farm's place. Such a duty, if it existed, would have included the duty to defend and the obligation to equitably share the defense expense burden incurred by United.

Apparently, other settlement negotiations were undertaken and ultimately a global resolution of all of the damage actions and claims was completed by December 14, 1990. It is undisputed that until that date, United was providing primary coverage including a defense for Carley, Cal Coast and the CRA.

As already noted, upon the resolution of the underlying damage actions this proceeding was commenced to settle the disputes existing between the several insureds and their multiple insurers as to how this very substantial loss, and the extensive defense costs which were incurred, might be shared. Except for the instant dispute, all of these claims and counterclaims have been resolved by agreement among the parties following entry of the trial court's judgment.

The trial court held that while it was true that State Farm's payment in 1988 of its $1 million policy limits did exhaust those limits, Scottsdale nonetheless had no duty to provide a defense to Carley, Cal Coast or the CRA. As a result, it had no obligation to equitably contribute to the defense costs which United had incurred. Scottsdale was therefore entitled to judgment on United's cross-complaint. The court gave three reasons for this

[5]Scottsdale contributed $500,000 to this settlement for reasons not explained in the record. We are aware of no contention that its agreement to do so has any impact, one way or the other, on the question before us.

conclusion: (1) the insureds were still receiving primary coverage from United and an excess insurer does not have to drop down until the exhaustion of *all* primary insurance on the risk; (2) the insureds had actual knowledge of the subsidence and the damage it had allegedly caused *prior* to issuance of the Scottsdale policy; therefore coverage under Scottsdale's policy was precluded by the "loss in progress" rule (Ins. Code, §§ 22 & 250); and (3) the subsidence exclusion in Scottsdale's policy precluded coverage.

United asserts that the trial court erred, as a matter of law, on all three points and has filed this timely appeal.

## CONTENTIONS

 United argues that the trial court misconstrued the language of Scottsdale's policy and that Scottsdale had a duty to drop down and contribute to the primary coverage burden as soon as State Farm's underlying primary policy was exhausted. According to United, Scottsdale's policy was expressly excess to State Farm's policy; as soon as the latter was exhausted, Scottsdale's duty arose and the existence of other primary coverage was irrelevant.

United also argues that in view of recent Supreme Court rulings which were handed down after the trial court's decision, the "loss in progress" rule can have no application in this case. Finally, United disputes that the subsidence exclusion precludes a defense duty because there were other "claims" of defective construction of improvements asserted in the underlying damage actions. Although ultimately found to be without merit by the trial court (all of the damages suffered by homeowners were found to be due to subsidence), the *allegation* of those claims was sufficient to raise a *potential* of coverage and therefore a duty to defend.

These latter two arguments may have some merit. However, we do not reach them because we resolve the first issue in Scottsdale's favor and thus have no need to reach or discuss the other two issues.

## DISCUSSION

### 1. *Scottsdale's Exposure Was Excess to All Primary Insurers*

 "There are two levels of insurance coverage—primary and excess. Primary insurance is coverage under which liability 'attach[es] to the loss immediately upon the happening of the occurrence.' [Citation.] Liability

under an excess policy attaches only after all primary coverage has been exhausted. [Citation.]" (*North River Ins. Co.* v. *American Home Assurance Co.* (1989) 210 Cal.App.3d 108, 112 [257 Cal.Rptr. 129].) As we shall explain, this general statement is the controlling principle which is dispositive of this case. Unless the provisions of an excess policy provide otherwise, an excess insurer has no obligation to provide a defense to its insured before the primary coverage is exhausted. (*Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 23 Cal.App.4th 1774, 1779-1780 [29 Cal.Rptr.2d 32].)

▮ There is no dispute that Scottsdale's $5 million coverage was purchased as excess to the $1 million primary policy issued by State Farm. However, the express provisions of the policy further provide that Scottsdale's liability was also excess to "the applicable limits of *any other underlying insurance* collectible by the [insured parties]." (Italics added.) This express description as to the scope of Scottsdale's excess coverage is entirely consistent with, and is reinforced by, other policy language dealing with Scottsdale's duty to defend and the impact of "other insurance." Scottsdale agreed to defend its insured provided that "no other insurance affording a defense or indemnity against such a suit is available." The policy also provided that the insurance afforded by the policy "shall be excess insurance over any other valid and collectible insurance available to the [insured parties] whether or not described in the Schedule of Underlying Insurance" (which schedule listed State Farm's $1 million policy).

This policy language, particularly when read in the context of the entire policy, is certainly unambiguous. Indeed, it could hardly be more clear. "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense, or unless a special meaning is given to them by usage.' (*Id.*, §§ 1638, 1644.) ▮ If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666-667 [42 Cal.Rptr.2d 324, 897 P.2d 1].) ▮ Applying these settled rules of policy construction to the language of the Scottsdale policy, Scottsdale's exposure was excess to all other primary insurance available to Carley, Cal Coast and

the CRA. The trial court found that United was one of several insurers providing primary coverage for the defense and indemnity of the underlying actions. That finding is not challenged by United in this appeal.

### 2. An Excess Insurer Has No Duty to Defend Until the Underlying Insurance Has Been Exhausted

It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted. (See *Iolab Corp.* v. *Seaboard Sur. Co.* (9th Cir. 1994) 15 F.3d 1500, 1504.) The leading California case on the point is *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593 [178 Cal.Rptr. 908]. In that case, as here, the secondary insurance had been written as "specific excess" to one of two primary policies and provided $2 million in coverage. The primary policy seconded by that excess policy provided only $20,000 in coverage. The other primary policy provided $1 million. The underlying wrongful death actions were settled for the sum of $495,000 after a defense expenditure of nearly $143,000. A declaratory relief action was brought in which a judgment was sought requiring the excess insurer to contribute to both the amount of the settlement and the defense costs. The court held that since *all* of the primary insurance had not been exhausted by the settlement, the excess insurer had no obligation to provide a defense or contribute to the settlement. It did not matter that the primary policy to which the secondary policy had been specifically excess had itself been exhausted. "A secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted. *This principle holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy.*" (*Id.*, at p. 600, italics added; see also *McConnell* v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637, 646 [16 Cal.Rptr. 362, 365 P.2d 418], disapproved on another point in *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 814 [180 Cal.Rptr. 628, 640 P.2d 764]; *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 633-634 [40 P.2d 311].)

The California general rule that *all* primary insurance must be exhausted before a secondary insurer will have exposure favors and results in what is called "horizontal exhaustion." This is contrasted with "vertical exhaustion" where coverage attaches under an excess policy when the limits of a specifically scheduled underlying policy is exhausted and the language

of the excess policy provides that it shall be excess only to that specific underlying policy.[6]

 This is a particular problem in continuous loss cases, such as the one before us. In such cases, primary liability insurers may have exposure to defend (and perhaps indemnify) claims arising before or after the effective dates of such policies. As a result of the Supreme Court's conclusion that a continuing or progressively deteriorating condition which causes damage or injury throughout more than one policy period will potentially be covered by *all* policies in effect during those periods (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at pp. 686-687), the "horizontal exhaustion" versus "vertical exhaustion" issue will become an increasingly common one to be resolved.

As we find to be the case here, primary policies may have defense and coverage obligations which make them underlying insurance to excess policies which were effective in entirely different time periods and which may not have expressly described such primary policies as underlying insurance. Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose*. In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, *all* of the primary policies must exhaust before *any* excess will have coverage exposure.

### 3. *Scottsdale Had No Obligation to Provide a Defense*

Given the foregoing rules and the express provisions in its excess policy, Scottsdale had no duty to provide a defense until there had been exhaustion of *all* of the primary policies. Although State Farm's liability limits were reached and exhausted, United's clearly were not. Indeed, the underlying cases were all finally resolved by settlement on December 14, 1990, and, as of that time, United still had not exhausted its policy limits. Scottsdale's responsibility to respond was not triggered by State Farm's exhaustion; not until exhaustion of *all* primary policies, including United's, would Scottsdale have had any duty to provide a defense to the insureds.

[6]If an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that *all* primary coverage must be exhausted. However, that is not the case here. As the quoted provisions of Scottsdale's policy make clear (see *ante*), it was intended to be excess to *all* underlying insurance, whether such insurance was described in the schedule of underlying insurance or not.

United argues that Scottsdale's policy expressly provides that it is excess to State Farm's policy and that its duty to participate in the defense arose upon State Farm's exhaustion. United also contends that since its third policy expired before the effective date of Scottsdale's policy, then United's policy could not be "underlying insurance" within the meaning of Scottsdale's policy. We reject both arguments.

First, as we have quoted above, the "drop down" provisions of the Scottsdale policy are contained in the "Limits of Liability" section. The relevant provision requires "exhaustion" before the drop down obligation will arise. United's reliance on this language is misplaced. Indeed, United's argument necessarily begs the very question on which our resolution of this matter depends: Has exhaustion occurred or not? What is required for exhaustion to occur is clearly set out in other portions of the Scottsdale policy's insuring clauses. Those other provisions do not limit the coverage of the Scottsdale policy to only the "excess" over the State Farm limits, but *expressly* extends it to "the applicable limits of *any other underlying insurance* collectible by the [insureds]." (Italics added.) The only reasonable interpretation of this policy language is that the term "underlying insurance" must be read to include all available primary insurance, not just the policy expressly listed on the schedule of underlying insurance. This conclusion is confirmed and reinforced by the "Defense" and "Other Insurance" sections of the Scottsdale policy which contain additional and consistent provisions which compel rejection of United's contention. The coverage provided by United clearly was "other underlying insurance" within the meaning of Scottsdale's policy. As one court put it, "[w]e must conclude that when a policy which provides excess insurance above a stated amount of primary insurance contains provisions which make it also excess insurance above *all other* insurance which contributes to the payment of the loss together with specifically stated primary insurance, *such clause will be given effect as written.*" (*Peerless Cas. Co.* v. *Continental Cas. Co.* (1956) 144 Cal.App.2d 617, 626 [301 P.2d 602], italics added.) In other words, an excess insurer can require in its policy that all primary insurance be first exhausted. Consistent with the horizontal exhaustion rule, that is what Scottsdale effectively did in this case. Because exhaustion of all available primary (or underlying) insurance never occurred, Scottsdale's duty, under the terms of its policy, to "drop down" and provide a defense never arose.

United's second argument must fail because it ignores the implications of the Supreme Court's continuing loss conclusion in *Montrose.* Although that court did not deal with the issue of horizontal exhaustion, it did make it clear that all primary insurers on the risk during the period when a continuing loss

caused damage would be required to provide a defense. Thus, even though United's policy had expired, it was still required to provide the common insureds a defense to the claims arising from the continuing subsidence loss which had caused damage during its policy period. Therefore, United's policy, despite its expiration, constituted "other underlying insurance" under Scottsdale's policy. Given the rules announced in *Montrose*, it does not matter that United's third policy had expired prior to the effective date of Scottsdale's policy.

For these reasons, Scottsdale's duty to provide a defense was never triggered and the underlying actions were all settled and resolved prior to exhaustion of *all* of the primary policies. Thus, all defense expenditures were incurred by one or more primary insurers without exhausting the policy limits of all of the primary policies. Therefore, Scottsdale had no duty to provide a defense and thus has no obligation to contribute to the cost of that defense and the trial court's judgment in favor of Scottsdale was correct.

## DISPOSITION

The judgment is affirmed. Scottsdale shall recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied November 27, 1996.