[No. B126862. Second Dist., Div. Seven. June 7, 2000.]

MONTGOMERY WARD & COMPANY, INCORPORATED et al., Plaintiffs and Appellants, v. IMPERIAL CASUALTY AND INDEMNITY COMPANY, Defendant and Appellant; CENTURY INDEMNITY COMPANY et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of confidential portions of the factual background (filed under seal) and parts II. (also filed under seal), III., V. and VI.

357

## Counsel

Troop, Steuber, Pasich, Reddick & Tobey, David W. Steuber, Mary K. Barnes, Jeffrey M. Jacobberger; Hedlund, Hanley & John, Kay Pick and Michael Rachlis for Plaintiffs and Appellants.

Gordon & Rees, Sara M. Thorpe and Patricia Scott Goodman for Defendant and Appellant Imperial Casualty and Indemnity Company and for Defendant and Respondent Century Indemnity Company.

Lillick & Charles and James R. Forbes for Defendant and Respondent The Home Insurance Company.

## OPINION

**JOHNSON, J.**—Plaintiff and appellant Montgomery Ward filed this lawsuit against four insurance companies, seeking a declaration of coverage and compensatory damages for breach of contract under certain comprehensive general liability policies issued from 1962 to 1976. Montgomery Ward sought coverage for defense and indemnity costs it had incurred because of alleged environmental contamination occurring over a number of years at three automotive service centers it operated in California. After disposing of certain issues by summary adjudication, the trial court dismissed all remaining causes of action in Montgomery Ward's suit. The court ruled Montgomery Ward's "self-insured retentions" (SIR's)—the amounts of any loss for which Montgomery Ward retained responsibility under the terms of its policies, ranging from $50,000 to $250,000 for each policy—were the equivalent of primary insurance. The court then applied the principle that all primary insurance must be exhausted before any excess insurer has any obligation under an excess policy, thus requiring Montgomery Ward to exhaust its SIR's under as many as 20 potentially applicable policies before any of the insurers had any duty to indemnify Montgomery Ward. After applying this principle, the court found Montgomery Ward had been fully compensated for its remaining losses by its settlements with other insurers. We reverse.

### FACTUAL BACKGROUND

In September 1996, Montgomery Ward & Company, Incorporated and Montgomery Ward Realty Corporation (collectively, Montgomery Ward) sued four insurers—Imperial Casualty and Indemnity Company (Imperial), The Home Insurance Company (Home), Century Indemnity Company (Century)[1] and Travelers Indemnity Company (Travelers)—who issued successive comprehensive general liability policies to Montgomery Ward during the period from January 1, 1962, through May 1, 1976. With one disputed

---

[1]Century was sued as successor in interest to Indemnity Insurance Company of North America (IINA). All IINA policies are referred to as Century policies.

exception, the coverage was excess of an SIR, that is, the insurer agreed to indemnify Montgomery Ward against "ultimate net loss" or "all sums" Montgomery Ward became obligated to pay, to the extent such losses exceeded a specified amount, referred to as the "retained limit" or SIR.[2] Montgomery Ward sought coverage under these policies for defense and indemnity costs it had incurred in lawsuits by third parties alleging environmental contamination at three automotive service centers it operated in California, located in Pleasant Hill, Canoga Park, and on Florin Road in Sacramento. The losses incurred by Montgomery Ward were alleged to be continuous losses across multiple policy periods which would, under California law, trigger coverage under all liability policies in effect across the triggered periods.

The underlying environmental claims against Montgomery Ward at the three California sites had been resolved as follows:

— At the Pleasant Hill site, leased by Montgomery Ward since 1962, Montgomery Ward claims it incurred approximately $1 million to defend a lawsuit brought in 1992 alleging environmental contamination, and it ultimately was ordered to pay the plaintiff in that case almost $109,000 in damages plus costs of appeal (the Schnugg case).

— The Canoga Park site, where Montgomery Ward owned and operated a gas station and automobile service facility from 1965 to 1984, was the subject of a lawsuit initiated in 1990 by an adjacent property owner (the Rockwell case), as well as an order by the California Regional Water Quality Control Board (RWQCB) in 1991 to remediate contamination at the site and at the neighboring Rockwell property. Montgomery Ward claims to have incurred more than $1.1 million in defense costs and paid $2.4 million to settle the Rockwell lawsuit, as well as costs of more than $800,000 in

---

[2] Policy years, insurers, SIR's and liability limits were as follows:

| Year | Insurer | SIR | Liability Limits |
|------|---------|-----|------------------|
| 1/1/62 - 1/1/63 | Century | $50,000 | $ 1 million |
| 1/1/63 - 1/1/64 | Century | $50,000 | $ 1 million |
| 1/1/64 - 1/1/65 | Century | $50,000 | $ 1 million |
| 1/1/65 - 1/1/66 | Century | $50,000 | $ 1 million |
| 1/1/66 - 5/1/66 | Century | $50,000 | $ 1 million |
| 5/1/66 - 5/1/69 | Travelers | $50,000 | $ 1 million |
| 5/1/69 - 5/1/72 | Home | $50,000 | $ 1 million |
| 5/1/72 - 5/1/75 | Home | $50,000* | $ 1,050,000 |
| 5/1/75 - 5/1/76 | Imperial | $250,000 | $ 1 million |

*The existence of an SIR on the Home policy for May 1, 1972—May 1, 1975, is disputed by Montgomery Ward, as discussed in an unpublished portion of this opinion.

connection with remediation of the site pursuant to the RWQCB order and the Rockwell settlement.

— The Florin Road site, where Montgomery Ward operated a gas station and automobile service facility from 1969 to 1986, was the subject of a RWQCB remediation order in 1989, in connection with which Montgomery Ward claims it spent more than $1.8 million. In 1994, Citizens Utilities Company of California sued for contamination of its well near the Florin Road site. That suit was settled for $150,000, and Montgomery Ward claims expenditures of $105,752.03 in defending the suit.

In addition to the lawsuit which is the subject of this appeal, in April 1995 Montgomery Ward had begun an environmental coverage action in Illinois against the four insurers who were defendants here and against Forum Insurance Company (Forum), involving eight sites outside California. That suit included the same policies at issue here, as well as successive policies issued by Forum from 1976 to 1986 with varying amounts of coverage, all subject to a $250,000 SIR.[3]

In October 1996, Montgomery Ward settled its coverage disputes with Forum, which is an "indirect subsidiary" of Montgomery Ward, and in February 1998 Montgomery Ward also settled with Travelers.[4]

PROCEDURAL HISTORY

After the Traveler's settlement, Imperial and Century brought a motion for summary adjudication of the Pleasant Hill claim, to which Home brought a joinder.[5] The trial court granted this motion and dismissed all claims against Century[6] and two of the six causes of action against Imperial and Home. The three companies (collectively, Insurers) argued and the trial court agreed SIR's should be treated like primary insurance. Applying the principles (a) all primary insurance must be exhausted before an excess insurer has any obligation to indemnify the insured, and (b) in cases of continuous loss across multiple policy periods, coverage is triggered under all policies in effect during the period of continuing loss, the trial court concluded the

---

[3]After 1986, all policies issued had absolute pollution exclusions.

[4]Briefs for Montgomery Ward, Imperial and Century, as well as selected portions of appellants' appendix, were filed under seal with permission of the court, to maintain the confidentiality of the terms of these settlements. For the same reason, the remaining portion of the factual background and part II of this opinion are filed under seal.

[5]The trial court treated Home's joinder as a separate motion for summary adjudication.

[6]Century's last policy period ended on May 1, 1966, prior to Montgomery Ward's involvement in the Florin Road and Canoga Park sites, so Montgomery Ward's claims against Century were limited to the Pleasant Hill site.

Insurers had no liability, since Montgomery Ward's SIR's on all the potentially triggered policies far exceeded its indemnity costs ($109,000) at Pleasant Hill.[7]

Then, as the originally scheduled trial date approached, Imperial and Home filed a motion to dispose of legal issues prior to the trial, or alternatively, for bifurcation of the trial so certain legal issues would be determined before a jury was empanelled. The trial court decided to bifurcate the trial, and set a schedule for briefing of the legal issues to be decided on the first day of trial, then scheduled for July 13, 1998. Prior to the trial date, the court also (a) on March 16, 1998, denied Montgomery Ward's motion for summary adjudication against the Insurers on their affirmative defenses, and (b) on May 27, 1998, denied Montgomery Ward's motion to amend its complaint to add causes of action against Home and Imperial for breach of the covenant of good faith and fair dealing. At the hearing on July 13th,[8] the trial court applied the same principles it applied to the Pleasant Hill site—all SIR's for all policies in effect over the period of continuing damage (including Forum policies) were the equivalent of primary insurance, and must be exhausted before the excess insurers had any obligation to indemnify Montgomery Ward. Under this theory, the damages at Florin Road (indemnity and defense costs of $2.1 million) did not exceed applicable SIR's of at least $2.9 million. At Canoga Park, Montgomery Ward's indemnity damages exceeded applicable SIR's. However, the trial court then allocated the Forum and Travelers settlements, and found Montgomery Ward had already been compensated for those damages as well as for its defense costs by those settlements, thus disposing of the Canoga Park claims as well. Judgment was entered dismissing all claims on August 21, 1998. Montgomery Ward filed its notice of appeal on October 16, 1998, and Imperial filed a protective cross-appeal that was stamped filed on February 18, 1999. Montgomery Ward filed a motion to dismiss Imperial's cross-appeal as untimely, and on April 12, 1999 we deferred a ruling on the motion to dismiss the cross-appeal to the time of hearing on the appeal.

[7]The trial court had previously (on Mar. 11, 1998) granted Montgomery Ward's motion for summary adjudication against Imperial and found Imperial had a duty to defend Montgomery Ward under its policy "once the underlying insurance coverage had been used up." In the March 13 ruling, the court said, as to the Pleasant Hill site, the SIR in the policies at issue defeated any duty to defend under the policies.

[8]The characterization of the July 13th proceedings as a trial is disputed, with Montgomery Ward arguing that it expected a status conference. It is clear that the trial court considered the proceedings to be in the trial phase, but acceded to Montgomery Ward's request to call the July 13th proceedings a status conference, in case it appeared from the briefing that witnesses might be needed in connection with the legal issues. When he set the schedule, the judge said: "Status conference 8:30, July 13. The discovery dates, et cetera, are not extended. I do consider this, as I indicated, a trial so we are not continuing the—we are not reopening anything except for this."

## DISCUSSION

The principal issue raised by Montgomery Ward on appeal is whether the trial court erred in concluding SIR's may be treated as primary/underlying insurance to which the rule of horizontal exhaustion applies, requiring Montgomery Ward to exhaust its SIR's on all potentially applicable policies before any insurer has any duty to indemnify Montgomery Ward for its losses. We conclude SIR's are not primary insurance and the principle of horizontal exhaustion does not apply. We also find Imperial had a duty to defend Montgomery Ward (and Imperial's cross-appeal on this point was timely). In the unpublished portions of the opinion, we decide (a) the trial court must reconsider its conclusion that the Forum and Travelers settlements fully compensated Montgomery Ward for its claims (pt. II, filed under seal), (b) the trial court correctly concluded the Home policy contained an SIR (pt. III), and (c) there was no abuse of discretion in the trial court's denial of Montgomery Ward's motion for summary judgment on the Insurers' affirmative defenses or in its refusal to permit Montgomery Ward to amend its complaint to add a bad faith claim (pts. V and VI).

Because the trial court erred in treating SIR's as primary insurance, the judgment must be reversed and the case remanded to the trial court for further proceedings.[9]

### I. SIR's Are Not "Underlying Insurance" or "Primary Policies" and the Principle of Horizontal Exhaustion Does Not Apply.

■■ The trial court's decision and the Insurers' arguments on appeal depend upon the conclusion the retained limits or SIR's in the insurance policies issued to Montgomery Ward are the same as primary or underlying insurance. There is no support for this conclusion in the language of the policies themselves, nor do we find any pertinent support in California precedent. Accordingly, like our colleagues in the First District in *California Pacific Homes, Inc. v. Scottsdale Ins. Co.* (1999) 70 Cal.App.4th 1187 [83 Cal.Rptr.2d 328], we conclude the principle of horizontal exhaustion does not apply to SIR's in these circumstances.

---

[9]For purposes of its ruling on the SIR's, the trial court assumed that all policies and policy years provided coverage for Montgomery Ward's losses (all of which remains in dispute). On appeal, Montgomery Ward also argues that the trial court erred in determining the dollar amount of SIR's to be exhausted, without a prior jury finding as to which policies and which policy years actually provide coverage. This point is moot in view of our conclusion that the horizontal exhaustion rule was improperly applied.

Some background is necessary for an understanding of the issue presented in this case. In *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878], the California Supreme Court established certain principles applicable in third party liability insurance cases involving continuous or progressively deteriorating damage or injury.[10] Specifically, *Montrose* established that standard comprehensive general liability (CGL) language provides coverage for property damage occurring during the policy period, and in the case of successive policies, damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods (the continuous injury trigger of coverage). (*Montrose, supra,* 10 Cal.4th at pp. 654-655.) The *Montrose* court described the "settled rule" that "an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains obligated to indemnify the insured for the entirety of the ensuing damage or injury," up to policy limits. (*Id.* at p. 686.) Then, in *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 339 [57 Cal.Rptr.2d 755], this court applied, in a continuing loss case, the long-settled rule "an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until all of the primary insurance has been exhausted." The court explained this general rule "favors and results in what is called 'horizontal exhaustion.'" (*Id.* at p. 339.) The court concluded: "Absent a provision in the excess policy specifically describing and limiting the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose.* In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, all of the primary policies must exhaust before any excess will have coverage exposure." (*Id.* at p. 340, italics omitted.)

The Insurers argue the SIR's or retained limits in the "excess" policies they issued to Montgomery Ward were themselves "primary policies" for purposes of the horizontal exhaustion rule. If that is so, then in this continuing loss case, Montgomery Ward must satisfy its SIR under every potentially applicable policy—to the tune of at least $2.9 million for each occurrence—before any insurer under any of the policies has any responsibility. Such a result would require us to ignore completely the terms of the insurance

---

[10]A third party liability policy provides coverage for liability of the insured to a third party. Typically, "the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of . . . property damage caused by the insured." (*Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th at p. 663.)

contracts themselves, as well as to overlook the general guidance given by the Supreme Court on the subject of self-insurance. This we decline to do, and we see nothing in the cases cited by the Insurers that would require, or indeed support, such a result.

 We begin, as we must, by looking at the policy language. As the *Montrose* court explains: "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense, or unless a special meaning is given to them by usage.' . . . If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." (*Montrose, supra,* 10 Cal.4th at pp. 666-667, citations omitted.) We see no ambiguity in the policies at issue here. While there are differences among the policies, in practical effect their terms, for these purposes, are essentially the same. In each of the Century policies, for example, Century agreed to: "indemnify the insured for ultimate net loss in excess of the retained limit . . . ."

The policy states: "[Century]'s limits of liability shall be only for the ultimate net loss in excess of . . . Fifty Thousand Dollars ($50,000) as a result of any one occurrence or accident, *whether insurance shall be purchased by or in behalf of the insured or the insured shall retain such first loss for the insured's own account* (herein called the retained limit) . . . provided, however, that if other valid and collectible insurance is available to the insured for an amount greater than the retained limits . . . [Century] shall be liable only for ultimate net loss in excess of such insurance . . . ." (Italics added.) Century's (and Imperial's) policies also specifically say they are excess "[i]f other collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder . . . ." Home's policies say they are excess over "specific valid and Collectible Underlying Insurances whether scheduled hereunder or not."

We think this language is clear. In the event of a covered occurrence, Century (in the illustrated case) contracted to indemnify Montgomery Ward

for its ultimate net loss, as defined,[11] in excess of $50,000 (up to the policy limits), *whether or not* Montgomery Ward chose to protect itself with primary insurance. Indeed, all of the policies make it clear there is a difference between underlying insurance and retained limits, and the Insurers understood this difference when they entered into these contracts.[12] The Insurers now ask us to relieve them of this clear contractual obligation, and instead to deem retained limits in other potentially applicable policies to be primary insurance. To do so, we would have to find Montgomery Ward's SIR's in all of its policies constitute "other collectible insurance with any other insurer" (under the Imperial and Century policies) or "specific valid and Collectible Underlying Insurances" (under the Home policies), as to which the Insurers' policies are excess. This we will not do. We are offered no public policy or other compelling reason to engraft new meaning on plain language,[13] and accordingly "[w]e may not rewrite what they themselves wrote." (*Aerojet-General Corp. v. Transport Indemnity Co., supra*, 17 Cal.4th 38, 75.)

The cases cited by the Insurers do not give us pause in our conclusions. The Insurers refer us principally to *General Star Indemnity Co. v. Superior Court* (1996) 47 Cal.App.4th 1586 [55 Cal.Rptr.2d 322] and *Nabisco, Inc. v. Transport Indemnity Co.* (1983) 143 Cal.App.3d 831 [192 Cal.Rptr. 207], for the proposition (in Insurers' words) "self-insured retentions constitute primary insurance coverage which must exhaust before an excess policy is triggered." That is not quite so. Certainly an SIR in an insurance policy must be exhausted before the insurer is liable under that policy. This is the very nature of an SIR, and flows from the specific terms of the policy. The

---

[11]Ultimate net loss is defined as: "the sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable, either by adjudication or compromise with the written consent of [Century], . . . but shall exclude all salaries of employees and office expenses of the insured in investigation, adjustment and litigation. . . . Other loss and legal expenses (including attorney's fees, court costs and interest on any judgment or award) incurred with the consent of [Century] shall be apportioned in proportion to the respective interest as finally determined."

[12]As noted above, the Century policy specifically distinguishes between "insurance . . . purchased by or in behalf of the insured" and the retained limit. So do the Imperial and Home policies. Imperial's endorsement No. 3, entitled "Recognition of Underlying Insurance (Self-Insured Retentions Apply)" provided: "It is agreed that the Self-Insured Retentions as shown in Schedule A of this Policy shall continue to apply for the purposes of this Policy regardless of whether specific underlying insurance is available to the Insured."

Home's endorsement No. 6 provided: "It is understood and agreed that the Self-Insured Retention shall not apply in those cases where specific Underlying Coverage is available to the Insured, but such coverage afforded by this policy shall apply excess over such specific valid and Collectible Underlying Insurances whether scheduled hereunder or not."

[13]"As a general matter at least, we do not add to, take away from, or otherwise modify a contract for 'public policy considerations.' " (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 75 [70 Cal.Rptr.2d 118, 948 P.2d 909].)

*Nabisco* court also held the self-insurer in that case was responsible for defense costs attributable to the extent of its SIR, just as a primary insurer remains responsible for defense costs attributable to its coverage.[14] However, the court nowhere intimated SIR's constitute primary insurance coverage. The court in *Nabisco* simply refused to disregard express language in the insurer's policy, which deemed its coverage excess "[if] there is other insurance *or self-insurance*" (*Nabisco, supra,* 143 Cal.App.3d at p. 835, italics added), and therefore required the insured to shoulder defense costs to the extent of its self-insurance.

Similarly, in *General Star*, the court merely enforced the SIR in the insured's policy, saying the "policy must be enforced according to its plain terms" (*General Star Indemnity Co. v. Superior Court, supra,* 47 Cal.App.4th 1586, 1592, italics omitted), which included an SIR of $100,000 and provided the insurer had "the right but not the duty to assume charge of the defense" (*id.* at p. 1594). This court accordingly held the insurer was "in the position of an excess carrier having no obligations until the SIR was exhausted" (*ibid.*), with no obligation to defend. Likewise, in *City of Oxnard v. Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072 [44 Cal.Rptr.2d 177], the court applied express policy provisions in two policies stating the insurers were providing excess coverage which was only available after the insured became legally obligated for an ultimate net loss in excess of its retained limit or SIR ($100,000 and $200,000, respectively). Since the insured ultimately paid less than $100,000 of a settlement, the court concluded Oxnard was responsible for its own defense costs, since the settlement did not exceed its SIR. Again, the court said "[a]s a self-insurer, Oxnard was solely liable for defense expenses attributable to the extent of its SIR, just as a primary insurer is responsible for defense expenses attributable to the extent of its coverage." (*Id.* at pp. 1077-1078.) It is a great leap from these conclusions—all based on policy provisions—to the proposed principle an SIR is a primary policy and should be treated as primary insurance, and it is a leap we will not take.[15]

The significant point is that these cases, like all other insurance cases, look first to the terms of the policy. *Community Redevelopment Agency v.*

---

[14]The *Nabisco* court said: "Generally, an excess insurer has no duty to participate in the insured's defense or contribute to a settlement on its behalf until primary coverages are exhausted. . . . Even where an excess carrier's defense and indemnity obligations do arise, the primary insurer remains responsible for defense expenses attributable to its coverage. . . . A self-insurer is likewise responsible for the defense costs attributable to the extent of its self-insured retention." (*Nabisco, Inc. v. Transport Indemnity Co., supra,* 143 Cal.App.3d at p. 836.)

[15]Montgomery Ward has also drawn our attention to the *Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52 [92 Cal.Rptr.2d 597], and all parties have submitted letter briefs on the case. *Vons* involved the question whether the insured could use other insurance proceeds to satisfy an SIR, an issue not raised on this appeal. Consequently, while our decision is not inconsistent with principles discussed in *Vons*, the case has no direct

*Aetna Casualty & Surety Co., supra*, 50 Cal.App.4th 329 (*CRA*), the case applying the horizontal exhaustion principle Insurers ask us to apply here, likewise looked to the policy language, which it found "certainly unambiguous": the policy expressly provided the insurer's liability was excess to " 'the applicable limits of any other underlying insurance collectible by the [insured parties].' " (50 Cal.App.4th at p. 338, italics omitted.) Moreover, even aside from unambiguous policy language, *CRA* does not stand for the proposition all primary coverage must be exhausted before excess policies may be reached without regard to the terms of the excess policies. Indeed, the *CRA* court said "[i]f an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that all primary coverage must be exhausted." (50 Cal.App.4th at p. 340, fn. 6, italics omitted.) Here, the Insurers' policies state they are excess over a specifically described SIR and will cover a claim when that SIR is exhausted. Accordingly, *CRA* provides no comfort to Insurers on this point.

The Insurers also point to our decision in *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810 [54 Cal.Rptr.2d 176] as support for the proposition excess policies do not attach until policies of primary insurance are exhausted. That was indeed our conclusion, but (a) it begs the question of what are policies of primary insurance, and (b) the Insurers omit reference to the first principle from which our conclusion flowed: namely, "[t]he liability of excess insurers to the [insured] is a question of contract." (46 Cal.App.4th at p. 1850.) We reiterated this point later: "We have previously concluded that *by reason of the contractual provisions of the excess policies*, liability should rest, *to the fullest extent consistent with those provisions*, upon the primary carriers." (46 Cal.App.4th at p. 1860, italics added.)

Finally, we note our conclusion SIR's may not be deemed primary insurance coverage is consonant both with the Supreme Court's general statements about self-insurance in *Aerojet*, and with the First District's holding in *California Pacific Homes, Inc. v. Scottsdale Ins. Co., supra*, 70 Cal.App.4th 1187. The court in *Aerojet*, in holding an insured was not required to contribute with insurers to defense costs for periods during which it was effectively uninsured, observed: "In a strict sense, 'self-insurance' is a 'misnomer.' [Citations.] 'Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.' (Ins. Code, § 22.) '[S]elf-insurance . . . is

application to the issue before us. We note the *Vons* court looks, as we do, to the actual terms of the applicable policies.

equivalent to no insurance . . . .' [Citation.] As such, it is 'repugnant to the [very] concept of insurance . . . .' [Citation.] If insurance requires an undertaking by one to indemnify another, it cannot be satisfied by a self-contradictory undertaking by one to indemnify oneself." (*Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th 38, 72, fn. 20, italics omitted.)

In *California Pacific Homes,* the First District disposed of arguments similar to those raised here from insurers who had issued five successive policies, each of which covered losses arising from a single occurrence involving continuous or progressively deteriorating property damage taking place throughout the policy periods, and each of which was subject to a retained limit of $250,000. The trial court had granted summary judgment for the insured, finding each insurer was obligated to indemnify plaintiff for that portion of a settlement exceeding a single retained limit of $250,000. On appeal the court affirmed the judgment, observing, inter alia, the language of the policies was clear and explicit (*California Pacific Homes, Inc. v. Scottsdale Ins. Co., supra,* 70 Cal.App.4th at p. 1192), the trial court had correctly rejected the argument that because the injury was continuous and progressive over five years, all five policies provided coverage and thus all five retained limits must first be satisfied (70 Cal.App.4th at p. 1194), and further "stacking of retained limits would have the effect of affording an insured far less coverage for occurrence-based claims than the insured has purchased" (*ibid.*). The *California Pacific Homes* court thus rejected the insurers' request, as we do here, "to analyze this problem as one of allocation between insurers (themselves as excess carriers and [the insured] as a primary insurer) rather than as a question of the interpretation of a CGL policy between them and their insured." (*Ibid.*)

In sum, we see no basis in the insurance contracts, or in applicable law, from which to conclude Montgomery Ward's SIR's are the equivalent of policies of primary insurance.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. *The Trial Court Correctly Concluded Imperial Had A Duty to Defend Montgomery Ward, and on Remand Montgomery Ward Must Be Given an Opportunity to Prove Any Damages Resulting from Breach of the Duty.*

Montgomery Ward also claims on appeal it is entitled to damages resulting from Imperial's breach of its duty to defend Montgomery Ward in the

---

*See footnote, *ante,* page 356.

underlying lawsuits, regardless of whether Imperial had a duty to indemnify Montgomery Ward.

The trial court initially granted Montgomery Ward's motion for summary adjudication on the issue of Imperial's duty to defend, finding the Imperial policy "did include a duty to defend once the underlying insurance coverage had been used up," and "[t]he court cannot find that either endorsement 3 or 5 does away with this duty to defend, notwithstanding what effect it might have had on the eventual duty of indemnification." The court's subsequent ruling the SIR's were primary insurance, however, and the concomitant conclusion that, as in *City of Oxnard*, Montgomery Ward would be responsible for defense costs for claims resolved within those SIR amounts, produced the conclusion no damages flowed from Imperial's breach of the duty to defend.

Montgomery Ward naturally does not question the trial court's order granting summary adjudication against Imperial on the duty to defend, but does insist it is entitled to damages for Imperial's breach of that duty. Imperial filed a protective cross-appeal, arguing the court's ultimate conclusion no defense costs were owed was correct but the court erred in finding a breach of contract and in finding the Imperial policy included a duty to defend once the underlying coverage was exhausted. Montgomery Ward then filed a motion to dismiss Imperial's cross-appeal on the ground it was untimely filed.

A. *The Cross-appeal Was Timely.*

California Rules of Court, rule 3(c) provides that when a timely notice of appeal is filed, any other party may file a notice of appeal "within 20 days after mailing of notification by the superior court clerk of such first appeal or within the time otherwise prescribed by the applicable subdivision [rule 2(a)], whichever period last expires." Rule 2(a) provides: "[A] notice of appeal from a judgment shall be filed on or before the earliest of the following dates: (1) 60 days after the date of mailing by the clerk of the court of a document entitled 'notice of entry' of judgment; (2) 60 days after the date of service of a document entitled "notice of entry" of judgment by any party upon the party filing the notice of appeal, or by the party filing the notice of appeal; or (3) 180 days after the date of entry of the judgment. For the purposes of this subdivision, a file-stamped copy of the judgment may be used in place of the document entitled 'notice of entry.' " Here, Imperial did not file its cross-appeal until 180 days after the date of entry of the judgment

on August 21, 1998.[19] Montgomery Ward argues Imperial was required to file its notice of cross-appeal no later than 60 days after August 21, 1998, because it "appears" a file-stamped copy of the judgment was mailed to the parties along with the trial court's minute order on August 21, 1998. Unfortunately, there is no evidence in the record to confirm definitively the date on which the clerk of the court mailed (or indeed the fact that the clerk mailed) the file-stamped copy of the judgment to Imperial.

The record reflects (1) all counsel were notified on August 21, 1998, "by copy of this minute order via United States mail" that plaintiff's objections to the proposed judgment were overruled and the "judgment is signed and filed this date," and (2) by at least November 12, 1998, Imperial's counsel had in its possession a file-stamped copy of the judgment. (On that date, Imperial's counsel attached a file-stamped copy of the judgment (which was in turn attached to a copy of the trial court's minute order stamped "Received Aug 26 1998") as part of an exhibit to a declaration accompanying an ex parte application for entry of costs.) Montgomery Ward's declarations tend to show it received a copy of the judgment along with the minute order,[20] and Imperial is silent on the issue of how or when it received a file-stamped copy of the judgment. So, while it appears more likely than not the clerk of the court mailed a copy of the file-stamped judgment to all parties along with the court's minute order on August 21, 1998, there is no

---

[19]Montgomery Ward initially argued the appeal was untimely because it was filed on February 18, 1999, 181 days after entry of the judgment and therefore beyond the latest date for timely filing under any theory. Imperial's reply to Montgomery Ward's motion establishes to our satisfaction, by means of declarations and accompanying documentation, that although the notice of cross-appeal was stamped filed on February 18, 1999, it was actually received from Federal Express in the mail room of the superior court and delivered to department 39 of the superior court on February 17, 1999. (Declaration of Richard Bockman.) The clerk of department 39 provided a declaration she had received the notice through the superior court's mailroom, she had confirmed receipt in response to a call from the law office of Imperial's counsel (which call was evidenced by declaration of personnel from that law office to have been made on Feb. 17, 1999), and she had sent the notice to the clerical appeal processing unit via the court's messenger service. (Declaration of Cynthia Simmers.) Accordingly, since the notice was received in the office of the clerk of department 39 on February 17, 1999, the appeal was filed within the 180-day period specified by California Rules of Court rule 2(a). (*Pacific Southwest Airlines v. Dowty-Rotol, Ltd.* (1983) 144 Cal.App.3d 491, 493 [193 Cal.Rptr. 25] [notice of appeal stamped as filed some 30 days after last date for filing appeal was timely because notice was timely received; "it is . . . sufficient if the notice of appeal is presented to and received by any deputy clerk of the office of the clerk of the superior court for purposes of filing"].)

[20]Montgomery Ward says its files contain a copy of the minute order date-stamped "Received AUG 26 1998," that its copy of the judgment is not separately date-stamped, that in ordinary course it would be separately date-stamped if it had been received separately, and that its file copies of the two documents both contain two sets of staple marks which "line up exactly," consistent with being received together.

definitive evidence in the record this was so. Under these circumstances, we will adhere to the "well-established policy, based upon the remedial character of the right of appeal, of according that right in doubtful cases 'when such can be accomplished without doing violence to applicable rules.'" (*Hollister Convalescent Hospital, Inc. v. Rico* (1975) 15 Cal.3d 660, 674 [125 Cal.Rptr. 757, 542 P.2d 1349], quoting *Slawinski v. Mocettini* (1965) 63 Cal.2d 70, 72 [45 Cal.Rptr. 15, 403 P.2d 143].) Accordingly, we conclude the time for appeal did not expire until 180 days after the date of entry of the judgment, and therefore Imperial's cross-appeal was timely.

### B. *Imperial Had a Duty to Defend.*

We conclude under the terms of its policy Imperial had a duty to defend Montgomery Ward, and on remand Montgomery Ward must be given an opportunity to prove its damages as a result of Imperial's breach of the insurance contract.

Once again, some background is necessary to an understanding of the issue raised by Montgomery Ward. In addition to the duty to indemnify the insured for a covered claim, standard comprehensive or commercial general liability insurance policies also provide the insurer has a duty to defend the insured in any action brought against the insured seeking damages for a covered claim. (*Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th 38, 57-58.) The insurer's duty to defend is broader than its duty to indemnify, extending "beyond claims that are actually covered to those that are merely potentially so . . . ." (*Id.* at p. 59.) "'This obligation is express in the policy's language. It rests on the fact that the insurer has been paid premiums by the insured for a defense. "The rule is grounded in basic principles of contract law." [Citation.] The duty to defend is contractual. [Citations.] . . . .'" (*Ibid.,* quoting *Buss v. Superior Court* (1997) 16 Cal.4th 35, 47 [65 Cal.Rptr.2d 366, 939 P.2d 766].) The point is important here, because the duty to defend arises as soon as tender is made and "before liability is established and apart therefrom . . . ," (17 Cal.4th at p. 58), so the insurer is responsible for those costs whether or not there is ultimately any duty to indemnify the insured for the claim.

Here, Imperial's claim that it has no duty to defend is grounded in substantial part on a variation of the point we have already decided: the argument that SIR's or underlying retentions are the same thing as underlying policies or underlying insurance. We have held they are not. The same principle applies here. As *Aerojet* instructs, we turn to the words of the policy. Imperial agreed: "With respect to any occurrence not covered by the

underlying policies listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 3(C) of the declarations, [Imperial] shall: (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . . ." There are no underlying policies listed on schedule A, which shows only an underlying retention of $250,000. Imperial says this retention is in effect an underlying policy and this provision is therefore a conditional duty to defend, which will never apply. Imperial's interpretation, however, would render the entire clause surplusage, and would require us to interpret "underlying policies" to mean "underlying retentions" when numerous other provisions of the policy show the parties understood these were two different things.[21]

Imperial argues its interpretation of the SIR as an underlying policy would be consistent with the policy terms as a whole, because "[a]ll of the policy forms and endorsements clearly provide that the policy is an **excess** policy which may reimburse defense costs as an element of 'ultimate net loss,' " and the endorsements show there was no intention to obtain a "first dollar" defense. These arguments are of no avail.

First, Imperial's focus on its policy as an excess policy is misplaced. It is true that in general, an excess insurer has no duty to participate in the insured's defense until primary coverages are exhausted. (*City of Oxnard v. Twin City Fire Ins. Co., supra,* 37 Cal.App.4th at p. 1077; *Nabisco, Inc. v. Transport Indemnity Co., supra,* 143 Cal.App.3d at p. 836.) However, we have already concluded an SIR is not primary coverage. Moreover, the terms of the policy are controlling. Here—in contrast to express policy provisions in *Nabisco* and *City of Oxnard*—the duty to defend is explicitly stated, and the existence of a retained limit or SIR is not inconsistent with a first dollar duty to defend if the policy so provides. Indeed, (1) section 2 of the Imperial policy requires Montgomery Ward to reimburse Imperial for any ultimate net loss Imperial pays on its behalf within the retained limit, but explicitly

---

[21]For example, endorsement No. 3 is entitled "Recognition of Underlying Insurance (Self-Insured Retentions Apply)," and provides "It is agreed that the Self-Insured Retentions as shown in Schedule A of this Policy shall continue to apply for the purposes of this Policy regardless of whether specific underlying insurance is available to the Insured." Similarly endorsement No. 6, defining the insured's retained limit, refers to "the total of the applicable sums of the underlying retentions listed on Schedule A hereof, and the applicable limits of any other underlying insurance collectible by the Insured . . . ." Endorsement No. 6 changed the words of the standard policy from "underlying *policies* listed in Schedule A" to "underlying *retentions* listed in Schedule A."

excepts defense costs from such reimbursement,[22] and (2) Imperial itself repeatedly notes some of the Forum policies contained a first dollar duty to defend—and they were also specifically "Excess of a $250,000. Self-Insured Retention."[23]

Second, as for the endorsements, only one of those merits comment. Endorsement No. 5 amended the definition of "ultimate net loss" to include the following (added words italicized): "This Policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance *or applicable to losses payable under the self-insured retentions shown in Schedule A.*" Imperial claims this endorsement, "along with the original policy language," clearly shows there was no intention to obtain a first dollar defense. Frankly, we are unable to glean precisely what the parties intended by this endorsement. The endorsement itself does not even purport to amend the policy provisions on the duty to defend, referring only to the definition of "ultimate net loss."[24] However, if Imperial intended by this clause (or any other) to vitiate the defense provisions of section 2 of the policy, it should have done so unambiguously.[25]

Under these circumstances, to the extent there is an ambiguity, we are bound to resolve it against the insurer. (*See Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th at p. 667.) The trial court was correct in its initial conclusion that Imperial had a duty to defend under the policy, and erred in dismissing the claims against Imperial.

V., VI.*

· · · · · · · · · · · · · · · · · · · · · · · · · ·

[22]The final sentence of section 2 says: "The insured shall promptly reimburse [Imperial] (*except Defense Costs*) for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item 3(C) of the declarations." ( italics added.)

[23]Forum's defense obligations are couched in similar language to the clause in the Imperial policy, providing that Forum "shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

· [24]We also note that the words once again show that the parties understood the difference between underlying insurance and SIR's.

[25]It may be that Endorsement No. 5 could be given effect, without doing violence to the duty to defend in section 2, in an instance where it is clear from the face of the third party complaint that there is no possibility that Montgomery Ward's potential exposure on the claim could exceed its SIR. (*Cf. Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275-276, fn. 15 [54 Cal.Rptr. 104, 419 P.2d 168] [referring to "cases which hold that the insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage"].) However, that is not this case and that question is not before us.

*See footnote, *ante,* page 356.

## DISPOSITION

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion. Montgomery Ward is awarded costs on appeal.

Lillie, P. J., and Woods, J., concurred.