Filed 9/8/17 (unmodified opinion attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MONTROSE CHEMICAL CORPORATION OF CALIFORNIA,<br><br>Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,<br><br>Respondent;<br><br>CANADIAN UNIVERSAL INSURANCE COMPANY, INC., ET AL.,<br><br>Real Parties in Interest. | B272387<br><br>(Los Angeles County Super. Ct. No. BC005158)<br><br>ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 31, 2017, be modified as follows:

On page 3 of the opinion, insert the name Deborah Lynn Stein in counsel listing for Real Parties in Interest Travelers Casualty and Surety Company and The Travelers Indemnity Company so that the opinion reads:  Simpson Thacher & Bartlett,

Peter R. Jordon, Andrew T. Frankel, and Deborah Lynn Stein for Real Parties in Interest Travelers Casualty and Surety Company and The Travelers Indemnity Company.

_____

EDMON, P. J.          ALDRICH, J.*          LAVIN, J.

_____

*      Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/31/17 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MONTROSE CHEMICAL CORPORATION OF CALIFORNIA,<br><br>    Petitioner,<br><br>    v.<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,<br><br>    Respondent;<br><br>CANADIAN UNIVERSAL INSURANCE COMPANY, INC., ET AL.,<br><br>    Real Parties in Interest. | B272387<br><br>(Los Angeles County Super. Ct. No. BC005158) |

Petition for writ of mandate from an order of the Superior Court of Los Angeles County, Elihu Berle, Judge.  Granted in part and denied in part with directions.

Latham & Watkins, Brook B. Roberts, John M. Wilson and Drew T. Gardiner for Petitioner.

No appearance on behalf of Respondent.

Sinnott Puebla Campagne & Curet, Kenneth H. Sumner and Lindsey A. Morgan for Real Party in Interest AIU Insurance Company.

Sinnott, Puebla, Campagne & Curet and Randolph P. Sinnott; Cozen O'Conner and John Daly for Real Party in Interest Zurich International (Bermuda) Ltd.

Duane Morris, Max H. Stern and Jessica E. La Londe for Real Party in Interest American Centennial Insurance Company.

Craig & Winkelman and Bruce H. Winkelman for Real Parties in Interest American Re-Insurance Company.

Selman & Breitman, Ilya A. Kosten and Kelsey C. Start for Real Parties in Interest Transport Insurance Company and Lamorak Insurance Company.

Selman & Breitman and Elizabeth M. Brockman for Real Party in Interest Federal Insurance Company.

Berkes, Crane, Robinson & Seal, Steven M. Crane and Barbara S. Hodous for Real Party in Interest Continental Casualty Company and Columbia Casualty Company.

Lewis Brisbois Bisgaard & Smith, Peter L. Garchie and James P. McDonald for Real Party in Interest Employers Mutual Casualty Company.

Barber Law Group and Bryan M. Barber for Real Party in Interest Employers Insurance of Wausau.

McCurdy & Fuller, Kevin G. McCurdy and Vanci Y. Fuller for Real Parties in Interest Everest Reinsurance Company, et al.

Chamberlin Keaster & Brockman, Kirk C. Chamberlin and Kevin J. Schettig for Real Parties in Interest Providence Washington Insurance Company, et al.

Tressler, Linda Bondi Morrison and Ryan B. Luther for Real Parties in Interest Allstate Insurance Company.

Archer Norris, Charles R. Diaz and GailAnn Y. Stargardter for Real Parties in Interest Fireman's Fund Insurance Company, et al.

Lewis, Brisbois, Bisgaard & Smith, Jordon E. Harriman and Shannon L. Santos for Real Parties in Interest General Reinsurance Corporation, et al.

Hinshaw & Culbertson, Thomas R. Beer and Peter J. Felsenfeld for Real Party in Interest Gerling Konzern Allgemeine Versicherungs-Aktiengesellschaft.

O'Melveny & Myers, Richard B. Goetz, Zoheb P. Noorani and Michael Reynolds for Real Party in Interest TIG Insurance Company.

McCloskey, Waring & Waisman and Andrew McCloskey for Real Parties in Interest Westport Insurance Corporation, et al.

Simpson Thacher & Bartlett, Peter R. Jordon and Andrew T. Frankel for Real Parties in Interest Travelers Casualty and Surety Company and The Travelers Indemnity Company.

Morgan Lewis & Bockius, Michel Y. Horton, Jeffrey S. Raskin and David S. Cox for ITT LLC and Santa Fe Braun, Inc. as Amicus Curiae on behalf of Petitioner.

Petitioner Montrose Chemical Corporation of California (Montrose) for many years manufactured the pesticide dichloro-diphenyl-trichlorethane (DDT).  Real parties in interest are insurers that issued excess comprehensive general liability (CGL) policies to Montrose in relevant years.  The present dispute concerns the sequence in which Montrose may access its excess CGL policies to cover its liability for environmental injuries caused by DDT.

Through a motion for summary adjudication, Montrose sought a declaratory judgment that it may "electively stack" excess policies—i.e., that it may access any excess policy issued in any policy year so long as the lower-lying policies for the *same policy year* have been exhausted.  All of the excess insurers opposed Montrose's motion for summary adjudication; many of the excess insurers also sought through a cross-motion for summary adjudication a ruling that no insurer had a duty to pay a covered claim until Montrose had "horizontally exhausted" its lower-lying excess policies in all triggered policy years.

The trial court rejected "elective stacking" in favor of "horizontal exhaustion," ordering that higher-level excess policies could not be accessed until lower-level policies had been exhausted for all policy years.  It thus denied Montrose's motion for summary adjudication and granted the excess insurers' cross-motion for summary adjudication.  Montrose then filed the present petition for writ of mandate challenging the trial court's summary adjudication order.

We agree with the trial court that "elective stacking" is inconsistent with the policy language of at least some of the more than 115 excess policies at issue and is not compelled by California Supreme Court authority.  We therefore conclude that

4

the trial court properly denied Montrose's motion for summary adjudication.  Our holding is not as expansive as the trial court's, however.  Specifically, we do not hold that policies must be horizontally exhausted at *each* coverage level and for *each* year before higher-level policies may be accessed.  Instead, we conclude that the sequence in which policies may be accessed must be decided on a policy-by-policy basis, taking into account the relevant provisions of each policy.  We therefore reverse in part the trial court's grant of the insurers' motion for summary adjudication.

## FACTUAL AND PROCEDURAL HISTORY

### I.

### Background

From 1947 to 1982, Montrose manufactured DDT at a facility in Torrance, California.  During the 1960's, conservationists began to raise concerns about the effects of DDT on the environment, and in 1972 the federal government prohibited its use within the United States.  Montrose continued to manufacture DDT for export at its Torrance facility until 1982. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 292–293 (*Montrose I*).)

In 1990, the United States and the State of California sued Montrose in the United States District Court for the Central District of California under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9607 et seq.) (CERCLA).  (*United States, et al. v. Montrose Chemical Corporation of California, et al.* (U.S. Dist. Ct. C.D.Cal.), 1990, No. CV 90–3122–AAH (JRx) (CERCLA action).) The CERCLA action alleged that Montrose's operation of its Torrance facility caused environmental contamination that

5

damaged land, water, and wildlife in the Los Angeles Harbor and neighboring waters.  (*Montrose I*, *supra*, 6 Cal.4th at pp. 292–293.)

Montrose represents that it has entered into partial consent decrees in the CERCLA action through which it has incurred damages in excess of $100 million, and that additional future damages could approach or exceed that amount.

## II.

## The Present Coverage Litigation

Montrose purchased "layers" of CGL policies from various insurance carriers to cover its operations at the Torrance facility from 1960 to 1986.  In each of the relevant years, Montrose purchased a layer of "primary" CGL insurance policies that required the insurers to defend and indemnify Montrose for covered losses up to the policy limits.  (*Montrose I*, *supra*, 6 Cal.4th at pp. 292–293.)  Above the "primary" insurance policies were multiple layers of "excess" CGL coverage, which provided additional coverage once underlying insurance was exhausted.  In the early years, Montrose purchased just a few layers of excess coverage; in some later years, Montrose appears to have purchased more than 40 layers of excess coverage, with aggregate limits of liability in excess of $120 million.  Montrose asserts that because the policies provide for different amounts of coverage in different years, the layers of excess coverage are not uniform.  To provide just a single example, in some policy years the first layer excess policies provided coverage of up to $1 million; in other years, the first layer excess policies provided coverage of up to $2 million, $5 million, or $10 million.

In August 1990, Montrose filed the present action, *Montrose Chemical Corporation of California v. Canadian*

*Universal Insurance Co., Inc., et al.*, case No. BC005158, to resolve various coverage disputes with its primary insurers. Subsequently, Montrose amended its complaint to name its excess insurers as additional defendants.

In 2006, the superior court stayed this action in response to Montrose's concern that discovery in this case could prejudice its defense in the CERCLA action. The court lifted the stay in June 2014.

In 2012, the California Supreme Court issued a decision in *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186 (*Continental*). As discussed more fully below, *Continental* held that where an ongoing environmental injury triggers multiple policies across many policy years, the insured may "stack" the policies " 'to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies.' " (*Id*. at pp. 200–201.)

Following the Supreme Court's decision in *Continental*, Montrose filed a Fifth Amended Complaint (complaint) in this action in September 2015. The complaint asserted a new 32nd cause of action for declaratory relief, seeking a declaration that:

"a.     In order to seek indemnification under the Defendant Insurers' excess policies, Montrose need only establish that its liabilities are sufficient to exhaust the underlying policy(ies) in *the same policy period*, and is not required to establish that all policies insuring Montrose in *every* policy period (including policies issued to cover different time periods both before and after the policy period insured by the targeted policy) with limits of liability less than the attachment point of the targeted policy, have been exhausted; and

7

"b.     Montrose may select the manner in which [to] allocate its liabilities across the policy(ies) covering such losses."

## III.

## Cross-Motions for Summary Adjudication

*A.     Montrose's Motion for Summary Adjudication*

Montrose moved for summary adjudication of the 32nd cause of action.  Montrose asserted that a controversy had arisen between it and its excess insurers about the manner in which it could obtain indemnification under the excess policies.  According to Montrose, the excess insurers had taken the position that Montrose could not access coverage under any excess policy until its liabilities exhausted *all* of the lower-lying excess coverage in *every* policy period.  Montrose depicted the insurers' approach as follows, assuming a hypothetical coverage portfolio and $100 million of liability resulting from continuous property damage over five years.  In this example, Montrose must exhaust its first and second layer excess policies (each layer representing $10 million of coverage) in each policy year before accessing any of its third layer excess policies:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| $50 mil Layer 5 |  |  |  |  |  |
| $40 mil Layer 4 |  |  |  |  |  |
| $30 mil Layer 3 |  |  |  |  |  |
| $20 mil Layer 2 |  |  |  |  |  |
| $10 mil Layer 1 |  |  |  |  |  |

Montrose rejected the insurers' horizontal exhaustion approach, asserting that it instead was entitled under the language of the excess policies and the Supreme Court's holding in *Continental* to "electively stack" its coverage—i.e., to "select any policy to indemnify its liabilities, provided the policies immediately underlying that policy are exhausted" in the same policy period. Montrose provided the following example of how elective stacking might work, using the same hypothetical losses and coverage portfolio depicted above. In this example, Montrose accesses coverage from the first through third excess insurance layers for policy years two and three, and the first through fourth excess insurance layers for policy year four, without accessing *any* excess coverage for policy years one and five:

|                  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|------------------|--------|--------|--------|--------|--------|
| $50 mil Layer 5  |        |        |        |        |        |
| $40 mil Layer 4  |        |        |        | ▓      |        |
| $30 mil Layer 3  |        | ▓      | ▓      | ▓      |        |
| $20 mil Layer 2  |        | ▓      | ▓      | ▓      |        |
| $10 mil Layer 1  |        | ▓      | ▓      | ▓      |        |

*B.* *Insurers' Oppositions and Cross-Motion for Summary Adjudication*

A group of excess insurers (hereinafter, the Continental insurers)[1] filed an opposition to Montrose's motion for summary

---

[1] Those insurers are: Continental Casualty Company (Continental) and Columbia Casualty Company (Columbia), joined by AIU Insurance Company; Allstate Insurance Company (as successor-in-interest to Northbrook Excess and Surplus Insurance Company; American Centennial Insurance Company (American Centennial); American Home Insurance Company; Federal Insurance Company; Employers Insurance Company of Wausau; Everest Reinsurance Company (as successor-in-interest to Prudential Reinsurance Company); Fireman's Fund Insurance Company; General Reinsurance Corporation; Granite State Insurance Company; Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor-in-interest to Employers Commercial Union Insurance Company of America and The Employers Liability Assurance Corporation, Ltd.; Landmark Insurance Company; Lexington Insurance Company; Mt. McKinley Insurance Company (as successor-in-interest to Gibraltar Casualty Company); Munich Reinsurance America, Inc. (formerly known as American Re-Insurance Company); National Surety Corporation; National Union Fire Insurance Company of Pittsburgh, PA; New Hampshire Insurance Company; North Star Reinsurance Corporation; Providence Washington Insurance Company (successor by way of merger to Seaton Insurance Company, formerly known as Unigard Security Insurance Company, formerly known as Unigard Mutual Insurance Company); Transport Insurance Company (as successor-in-interest to Transport Indemnity Company); Westport Insurance Corporation, formerly known as Puritan Insurance Company, formerly known as Manhattan Fire and Marine Insurance Company); and Zurich International (Bermuda), Ltd.

10

adjudication, and separately filed their own cross-motion for summary adjudication. That motion sought summary adjudication on two grounds: (1) the 32nd cause of action (by which the Continental insurers sought a determination that Montrose was not entitled as a matter of law to electively stack its excess policies), and (2) the following "issue of duty": "All underlying policy limits across the years of continuing property damage must be exhausted by payment of covered claims before any of the Insurers' excess policies ha[s] a duty to pay covered claims." The Continental insurers contended that well-established California law and the language of the relevant policies required Montrose to "exhaust coverage from *all* underlying insurers in each of the triggered policy periods, such that higher-level excess insurers' obligations are triggered only when all primary and lower-level excess policies have been exhausted." (Italics added.)

Travelers Indemnity and Travelers Surety (formerly known as Aetna) (the Travelers insurers) opposed Montrose's motion for summary adjudication, but did not separately move for summary adjudication. The Travelers insurers urged that California law did not apply to their policies, and that under the clear language of the policies, Montrose had to demonstrate that the underlying insurers "*have paid or been held to pay* the full amount of their respective limits of liability"—not merely that Montrose's liabilities "*are sufficient to exhaust* the underlying policy(ies) in the same policy period."[2] According to the Travelers insurers,

---

[2] The Travelers insurers therefore urged that the declaration sought by Montrose "appears to leave open the possibility that Montrose can access Travelers' higher-level excess policies (i) based solely on estimated liabilities that Montrose has not

11

Montrose's assertion that its primary policies should be "deemed" exhausted was "misleading because the parties have not stipulated—and the Court has not found or ordered—that Montrose's primary policies be 'deem[ed]' exhausted.  Montrose, of course, will have the burden of proving that, in fact, its underlying insurance (including with respect to primary coverage) has been exhausted before it can seek coverage under its excess policies.  That factual issue is not before the Court, and may not be decided in the guise of Montrose's Motion currently before the Court."

## IV.

### Order Denying Montrose's Motion and Granting Continental Insurers' Cross- Motion for Summary Adjudication

The superior court denied Montrose's motion and granted the Continental insurers' cross-motion.  The court began by describing the issues raised by the competing motions for summary adjudication:

"[I]t's the insurers' contention that Montrose cannot access coverage under any of the excess policies until Montrose exhausts

---

actually paid to date, (ii) based on liabilities allegedly incurred even if those liabilities were not actually paid by the underlying insurers (including settling insurers), or (iii) without showing that Montrose's liabilities are actually covered under the terms of the underlying policies such that they might one day exhaust those underlying policies."  Indeed, the Travelers insurers asserted, "Montrose's declaration would not even require Montrose to prove that its liabilities would be *covered* by underlying insurance, much less that they would ever actually exhaust that underlying insurance."  (Fn. omitted.)

12

all the underlying excess coverage in each policy period. This approach is generally referred to as a 'horizontal exhaustion.'

"In contrast, Montrose argues that it should instead be entitled to vertically stack all excess coverage triggered [in] each individual policy period, in effect allowing Montrose to select any available excess policy to indemnify its liabilities assuming that the policies immediately underlying that policy are exhausted for this specific policy in question. The approach is referred to as a 'vertical exhaustion.' "

The court then discussed the law generally applicable to primary and excess insurance:

"Before coverage can attach under an excess policy, the policy limits of the underlying primary policy or policies must typically be exhausted. [Citation.] [¶] Normally, primary coverage is exhausted when a primary insurer pays its policy limits to settle a claim or to satisfy a judgment against the insurer. [Citation.]

"Under California law, vertical exhaustion applies where an excess policy expressly provides coverage in excess of a specific primary policy for that same policy period. In such a scenario, excess coverage will attach after the specifically identified primary insurance has been exhausted, notwithstanding the existence of other underlying policies. [Citation.]

"On the other hand, horizontal exhaustion applies in those situations where an excess policy provides coverage in excess to all underlying insurance, whether specifically scheduled or not. [Citation.] [¶] . . . [¶]

"In cases such as the one before the court today in which the damages at issue occur continuously over a long period of

13

time, questions regarding policy exhaustion prove to be very complex.  [¶] . . . [¶]

"Consistent with the general rule[s] of insurance polic[y] interpretation, the first inquiry in continuous loss scenarios remains whether the excess policy imposes specific limits upon the coverage provider.

"As the California Court of Appeal held in *Community Redevelopment* [*Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329 (*Community Redevelopment*)], where an excess policy does not specifically describe . . . [¶] . . .and limit the underlying insurance policies [that must be exhausted], the horizontal exhaustion doctrine should apply."

The court then turned to the facts of the case before it:

"In the present case, Montrose argues that pursuant to the California Supreme Court holding in [*Continental*], Montrose should be entitled to access its excess coverage under an elective stacking approach whereby a policyholder may select any triggered policy in its portfolio to indemnify its liabilities, provided that the policies underlying that policy are exhausted in accordance with their terms.  [¶] . . . [¶]

"Ultimately, Montrose fails to cite any binding authority which persuades this court that the court should not follow the well-established rule that horizontal exhaustion should apply in the absence of policy language specifically describing and limiting the underlying insurance.

"Montrose additionally asserts that the language in [the] excess policies at issue here is inconsistent with application of the horizontal exhaustion doctrine.  In so arguing, Montrose suggests that each of the policies contained a provision or provisions which

14

specifies some identifiable amount of underlying limits that must be exhausted before its obligation attaches.

"More specifically, Montrose argues that each excess policy's description of the underlying limit or coverage that must be exhausted is described with respect to its same policy period. While this may be true, this argument overlooks the fact that the present case is a continuous loss scenario; thus, Montrose's contention that exhaustion should be applied vertically with respect to each individual policy period is undermined by the very authority supporting its own stacking arguments as noted by the California Supreme Court decision in [*Continental, supra,*] 55 Cal.4th 186, which decision allows the insured to stack the policy limits of those policies triggered in more than one policy period.

"Therefore, the stacking approach endorsed by the Supreme Court in *Continental* would direct . . . that the aggregate value of all underlying policies throughout the duration of a continuous loss must be exhausted before excess coverage is accessible to the insured . . . ."

The court concluded: "The 'other insurance' provisions contained in the present excess policies must be read to require the exhaustion of all underlying insurance before [the excess insurers'] obligations to indemnify Montrose attach. The presence of 'other insurance' clauses would preclude the use of a vertical exhaustion approach even for those excess policies specifically identified in a particular underlying policy that must first be exhausted. [¶] The [inclusion] of such broad 'other insurance' language invokes the rules set forth in *Community Redevelopment* that horizontal exhaustion must apply absent a provision of the excess policy that both specifically describes and

15

limits the underlying insurance. [¶] Whereas here the excess policy included language that invokes all underlying insurance, no such limitation can be reasonably argued to exist. [¶] . . . [¶]

"So in conclusion, in light of the authorities cited, the court concludes that the parties must employ a horizontal exhaustion approach, whereby the aggregate limits of underlying policies for the applicable policy periods must first be exhausted before any excess policies incur a duty to indemnify Montrose for its liabilities . . . ."

## V.

### Present Petition for Writ of Mandate

Montrose filed a petition for writ of mandate in this court, seeking an order directing the trial court to grant Montrose's motion for summary adjudication and deny the insurers' cross-motion for summary adjudication. We summarily denied the petition. Montrose filed a petition for review. The Supreme Court granted review and transferred the matter to this court with directions to issue an order to show cause why the relief sought in the petition should not be granted.

We issued an order to show cause and received supplemental briefing. The Continental insurers and the Travelers insurers filed briefs in opposition to the petition, and ITT LLC and Santa Fe Braun, Inc. filed an amicus curiae brief in support of Montrose.

### SUMMARY OF ISSUES

Montrose urges the court to adopt what it terms an "elective stacking" approach. Under this approach, where a policyholder is liable for a continuing injury that potentially is covered by primary and excess policies in multiple policy years, the policyholder "may elect to proceed 'vertically' to exhaust

16

policies for a single coverage year, once the underlying policy exhaustion provisions are satisfied." Montrose urges that "elective stacking" is consistent with Supreme Court precedent "recognizing that policyholders are entitled to look to any independent contract to cover the full extent of their liability (up to policy limits) in accordance with the terms of each individual policy," as well as with the language of the relevant excess policies.

The Continental insurers urge a "horizontal exhaustion" approach. They contend that the excess policies at issue contain provisions "that make them excess to vertically underlying policies in the same policy period *plus* 'other valid and collectible' insurance, that is, other insurance that is not vertically underlying and also triggered by the same occurrence." The Travelers insurers separately urge declaratory relief is premature because Montrose has not demonstrated that it has exhausted its underlying primary policies, and there is no basis for issuing a writ of mandate because Montrose has failed to demonstrate that it lacks an adequate remedy at law or is at risk of irreparable harm.

As we now discuss, we reject Montrose's "elective stacking" approach. Specifically, we conclude that Montrose is not entitled to a declaration that it may access *any* of the more than 115 excess policies at issue so long as its liabilities are sufficient to exhaust the underlying policies for the same policy year. We therefore conclude that the trial court properly denied Montrose's motion for summary adjudication and granted the insurers' cross-motion for summary adjudication of the 32nd cause of action because we conclude that Montrose is not entitled to the declaration sought in that cause of action *as a matter of law*.

17

However, we do not adopt the trial court's conclusion that all excess policies must be horizontally exhausted. Instead, because there is tremendous variation among the policies at issue, we decline to adopt a single exhaustion scheme that applies to Montrose's entire coverage portfolio, and instead direct that each policy be interpreted according to its terms. We therefore conclude that the trial court erred in granting the Continental insurers' motion for summary adjudication insofar as it sought to summarily adjudicate the issue of duty.

## STANDARD OF REVIEW

"A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).) The moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if [the moving party] carries [its] burden of production, [it] causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851, fn. omitted.)

We review de novo an order granting or denying a motion for summary adjudication. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 860.) The trial court's stated reasons for granting summary adjudication are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Haering v. Topa Ins. Co.* (2016) 244 Cal.App.4th 725, 732.)

18

# DISCUSSION

## I.

## Primary and Excess Insurance

There are two levels of insurance coverage—primary and excess. "*Primary* coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense. [¶] '*Excess*' or *secondary* coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. [Fn. omitted.] It is not uncommon to have several layers of secondary insurance." (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597–598, some italics omitted; see also *Community Redevelopment*, *supra*, 50 Cal.App.4th at pp. 337–338 [discussing primary and excess coverage].)

An excess insurance policy may be written as excess to specifically identified coverage—i.e., to "a particular policy or policies (e.g., 'excess to liability coverage provided under Aetna Policy No. 246789') (see *20th Century Ins. Co. v. Liberty Mut. Ins. Co.* (9th Cir. 1992) 965 F.2d 747, 757 (applying Calif. law)); or [¶] coverage provided by a particular insurer (e.g., 'excess to the primary insurer, Liberty Mutual') (see *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, *supra*, 965 F.2d at 757)." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2017) ¶ 8:181 (Croskey).) Alternatively, an excess policy may be written to provide coverage " 'in excess of (identified primary policy) and the applicable limits of *any other* underlying insurance providing coverage to the insured.' [¶] Under such a

policy, the excess insurer has no duty to defend or indemnify until *all underlying policies* available to the insured, whether or not listed in the excess policy, are exhausted.  [See [*Community Redevelopment, supra,*] 50 Cal.App.4th [at pp.] 339–341; *Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 645].”  (Croskey, *supra,* ¶ 8:182.)

The relationship between primary and excess insurance (or multiple layers of excess insurance) is particularly complex in environmental injury cases where harm is alleged to have occurred over many years and many policy periods.  Injuries of this kind, termed “ ‘long-tail’ ” injuries, are “a series of indivisible injuries attributable to continuing events without a single unambiguous ‘cause’ ” and produce progressive damage that takes place slowly over years or even decades.  (*Continental, supra,* 55 Cal.4th at p. 196.)  Because CGL policies typically are silent as to coverage for long-tail injuries, they frequently give rise to coverage disputes.  (*Ibid.*)

## II.
## The Trial Court Correctly Rejected Montrose’s “Elective Stacking” Approach; Therefore, It Correctly Denied Montrose’s Motion for Summary Adjudication and Granted the Continental Insurer’s Cross-Motion for Summary Adjudication of the 32nd Cause of Action

Montrose asserts that the trial court erred in rejecting elective stacking in favor of mandatory horizontal exhaustion.  Specifically, Montrose contends:  (1) elective stacking is the only approach consistent with the Supreme Court’s recent guidance in *Continental*; (2) each of the relevant policies contains express language stating that

20

coverage attaches upon exhaustion of specified underlying limits of lower-layer policies within the *same policy period*; and (3) elective stacking is consistent with sound public policy.  We consider each of these issues below.

> A.  Continental *Does Not Dictate "Elective Stacking" in This Case*

We begin by addressing Montrose's contention that the result in this case is dictated by the California Supreme Court's decision in *Continental*, *supra*, 55 Cal.4th 186.  Montrose asserts: "Over the last two decades, the California Supreme Court has repeatedly declared the fundamental principle that a policyholder has the contractual right, under any insurance policy (or policies) triggered by a covered loss, to obtain immediate indemnification of its liabilities. . . .  [¶]  . . .  [In *Continental*], the high court held that when a continuous injury triggers multiple policies, '*each* policy can be called upon to respond to the claim up to the full limits of the policy.  (*Id.* at p. 200, emphasis added.)"  Indeed, Montrose urges, the court in *Continental* "rejected the very scheme Defendant insurers argue[] for" and "confirm[ed] the policyholder's right to choose the policy(ies) and seek to allocate the losses vertically or horizontally as the policyholder sees fit."

As we now discuss, *Continental* does not dictate the result in this case.  Importantly, both the relevant policy language and the issues confronting the *Continental* court were very different from the language and issues before us; and nothing in *Continental* suggests that, in the context of the present case, an insured has an absolute right to "select which policy(ies) to access for indemnification in the manner they deem most efficient and advantageous."

21

1. *Continental*:  Insured Liable for Long-Tail Claim May "Stack" Policies Issued in Different Policy Periods

In *Continental*, *supra*, 55 Cal.4th 186, the Supreme Court considered insurers' indemnity and defense obligations in the context of a long-tail environmental injury.  Between 1956 and 1972, the State of California operated an industrial waste disposal facility that was later discovered to have leaked hazardous materials.  Before 1963, the state was uninsured; between 1964 and 1976, the state purchased ten excess CGL policies from different insurers.  The state had drafted a master liability policy form that it required its insurers to use, and thus the relevant language of each of the policies was essentially the same.  Specifically, each policy obligated the insurer " '[t]o pay on behalf of the Insured *all sums* which the Insured shall become obligated to pay by reason of liability imposed by law . . . for damages . . . because of injury to or destruction of property, including loss of use thereof.' " (*Continental*, *supra*, at pp. 192–193, italics added.)

After a federal court found the state liable for past and future cleanup costs associated with the disposal facility, the state sued several of its insurers, seeking indemnification for its liability in the federal action.  (*Continental*, *supra*, 55 Cal.4th at pp. 192–193.)  Following a bench trial, the superior court held that the state could not "stack," or combine, policy limits across multiple policy periods.  Instead, the state "had to choose a single policy period for the entire liability coverage, and it could recover only up to the total policy limits in effect during that policy period." (*Id.* at p. 193.)

The Supreme Court disagreed, concluding that the language of the policies at issue permitted the stacking of policy limits *across multiple policy periods,* so as to effectively create " ' "one giant uber policy" with a coverage limit equal to the sum of all purchased insurance policies.' " (*Id.* at p. 200–201, italics added.)

The Supreme Court began its analysis by reiterating basic principles of insurance interpretation:  "In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation.  [Citations.]  ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."  [Citations.]  'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.'  [Citation.]  'Such intent is to be inferred, if possible, solely from the written provisions of the contract.'  [Citation.]  'If contractual language is clear and explicit, it governs.'  [Citation.]  ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code,] § 1644), controls judicial interpretation.  [Citation.]" [Citations.]'  [Citation.] "  (*Continental, supra*, 55 Cal.4th at pp. 194–195.)

The court then addressed the "all sums" language of the relevant policies, explaining that such language "obligate[s] the insurers to pay all sums for property damage attributable to the [contaminated] site, up to their policy limits, if applicable, as long as some of the continuous property damage occurred while each policy was 'on the loss.' "  (*Continental, supra*, 55 Cal.4th at p. 200.)  This coverage "extends to the entirety of the ensuing

23

damage or injury [citation], and best reflects the insurers' indemnity obligations under the respective policies, the insured's expectations, and the true character of the damages that flow from a long-tail injury." (*Ibid.*)

*Continental* determined that the policies at issue enabled the insured "to stack the consecutive policies and recover up to the policy limits of the multiple plans. 'Stacking' generally refers to the stacking of policy limits across multiple policy periods that were on a particular risk. In other words, 'Stacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy.' [Citation.] 'When the policy limits of a given insurer are exhausted, [the insured] is entitled to seek indemnification from any of the remaining insurers [that were] on the risk . . . .' [Citations.] The all-sums-with-stacking indemnity principle . . . 'effectively stacks the insurance coverage from different policy periods to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies. Instead of treating a long-tail injury as though it occurred in one policy period, this approach treats all the triggered insurance as though it were purchased in one policy period. The [insured] has access to far more insurance than it would ever be entitled to within any one period.' [Citation.] The all-sums-with-stacking rule means that the insured has immediate access to the insurance it purchased. It does not put the insured in the position of receiving less coverage than it bought. It also acknowledges the uniquely progressive nature of long-tail injuries that cause progressive damage throughout *multiple* policy periods. [Citation.]" (*Continental, supra,* 55 Cal.4th at pp. 200–201.)

24

*Continental* emphasized that "absent antistacking provisions, statutes that forbid stacking, or judicial intervention, 'standard policy language *permits* stacking.' " (*Continental*, *supra*, 55 Cal.4th at p. 201.) The court therefore concluded that "the policies at issue here, *which do not contain antistacking language*, allow for its application. . . ." (*Id*. at p. 201, italics added.) The court noted, however, that there exists a "significant caveat" to all-sums-with-stacking indemnity allocation—i.e., that an insurer "may avoid stacking by specifically including an 'antistacking' provision in its policy. Of course, in the future, contracting parties can write into their policies whatever language they agree upon, including limitations on indemnity, equitable pro rata coverage allocation rules, and prohibitions on stacking." (*Id*. at p. 202.)

## 2. What *Continental* Did and Did Not Decide

As the foregoing discussion makes clear, the issue before the court in *Continental* was very different from the issue presented by the present petition. Before the court in *Continental* was the question of whether the insured could access policies in effect during multiple triggered policy periods, as the insured contended, or whether it could access only those policies that covered a single policy period, as urged by the insurers. The issue before us, in contrast, is not *whether* an insured can access policies written for different policy years (it can), but the *order or sequence* in which it may or must do so.

Moreover, as we have said, the court's analysis in *Continental* was based on the language of the particular policies before it in that case, and specifically the insurers' promises " '[t]o pay on behalf of the Insured *all sums* which the Insured shall become obligated to pay by reason of liability imposed by law . . .

25

for damages . . . because of injury to or destruction of property,' " up to specified policy limits.  (*Continental*, *supra*, 55 Cal.4th at p. 193, italics added.)  In contrast, many of the excess policies relevant to our analysis do not include "all sums" language, and thus the high court's analysis of the "all sums" language has limited application here.

Further, *Continental* did *not*, as Montrose asserts, announce a general principle that insureds covered by multiple policies are entitled to "select which policy(ies) to access for indemnification in the manner they deem most efficient and advantageous."  Indeed, *Continental* did not announce *any* general principles applicable to *all* insureds and *all* policies.  Instead, it reaffirmed the principle that insurance policies must be interpreted *according to their terms*, even if alternative allocation schemes might be more desirable.  (See *Continental*, *supra*, 55 Cal.4th at p. 199 ["Although some states have concluded, as the insurers urge in this case, that pro rata coverage would be more fair and equitable when compared to all sums allocation, we are constrained by the language of the applicable policies here."].)

Finally, while *Continental* held that each "triggered" policy may be called upon to respond to a claim (*Continental*, *supra*, 55 Cal.4th at p. 200), it did not consider when a higher-layer excess policy is "triggered" in the context of a long-tail environmental injury.  That is, *Continental* discussed the "trigger of coverage" issue *temporally*, explaining that " '[t]he issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be "triggered"? ' " (*Id*. at p. 196.)  Because it was not called upon to do so, the court in *Continental* did not consider the aspect of "trigger of coverage"

before us in this case—what lower-layer excess policies must be exhausted before a higher-layer excess policy is triggered.

In short, while *Continental* provides a general framework for our analysis, it provides limited guidance on the specific question before us: Whether Montrose may access higher-level excess insurance before exhausting lower-level excess insurance written for different policy periods. As *Continental* directs, we turn to the language of the relevant policies to decide that question.

> B.    *The Language of the Excess Insurance Policies Does Not Mandate "Elective Stacking"*
> > 1.    <u>The Policies' "Plain Language"</u>

Montrose acknowledges that the starting point of policy interpretation is "the 'plain language' of the written provisions of the insurance contract," and it asserts that each of the excess policies at issue contains "express language" stating "that coverage thereunder attaches upon the exhaustion of a specified amount of underlying insurance issued *in the same policy year*." (Italics added.) The latter assertion is the linchpin of Montrose's plain language analysis: If Montrose is correct that the policies provide for coverage as soon as lower-layer policies *within the same policy period* are exhausted, then elective stacking necessarily follows.

The problem with Montrose's analysis is that it is largely unsubstantiated by the policy language. That is, while Montrose repeatedly asserts that the excess policies attach upon the exhaustion of lower layer policies within the same policy period, it does not identify the provisions that supposedly have that effect.

27

Our analysis of the policies, moreover, leads us to conclude that many of the policies attach not upon exhaustion of lower-layer policies within the same policy period, but rather upon exhaustion of *all* available insurance. A few examples will illustrate the point:

(1) *American Centennial Policies Nos. XC-00-03-64, XC-00-06-75, and XC-00-12-16.* The insuring agreements of these policies state that the insurer "agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit[3] hereinafter stated." The declarations then identify the underlying policies to which the American Centennial policies are specifically in excess (the "scheduled policies"); for example, for policy year 1980 to 1981, the American Centennial policy references a Canadian Universal CGL policy, written for policy period March 1980 through March 1981, with a combined single limit of $1,000,000.

Focusing on only the insuring agreements and declarations, Montrose would have us conclude that the American Centennial policies attach upon the exhaustion of the scheduled policies—in the example provided above, when Montrose's liabilities exceed $1,000,000, thus exhausting the limits of the Canadian Universal policy. But that interpretation ignores other relevant policy provisions, including the following:

*The "retained limit" clause*: This clause provides: " '[T]he company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:

---

[3]     "Retained limit" "refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy." (Croskey, *supra*, ¶ 7:384.)

[¶] . . . the total of the applicable limits of the underlying policies listed in [the declarations] hereof, *and the applicable limits of any other underlying insurance collectible by the insured.'* " (Italics added.)  This clause thus expressly states that the excess insurer's liability is in excess of the identified underlying insurance *and* the applicable limits of *any other underlying insurance* collectible by the insured.

*The "other insurance" clause*:  This clause states:  " 'If other collectible insurance . . . is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder) the insurance hereunder shall be in excess of and not contribute with, such other insurance.' "  This clause thus provides that the American Centennial policies are excess to both *scheduled and unscheduled* policies.

(2)     *Continental Policies Nos. RDX 030 807 62 18, RDX 8893542, RDX 8936616 and RDX 8936617, and Columbia Policies Nos. RDX 1864012 and RDX 3652015.*  The indemnification provisions of these policies require the insurers " '[t]o indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the underlying insurance [identified in the schedule of primary and umbrella[4]

---

[4]     "Umbrella policies are usually excess policies in the sense that they afford coverage that is excess over underlying insurance.  [Citations.]  [¶]  However, an umbrella policy may also provide coverage for *losses not covered* by any underlying insurance; and as to those losses, the umbrella policy is primary [citation].  Umbrella policies may thus fill gaps in coverage both *vertically* (by providing excess coverage) and *horizontally* (by providing primary coverage for losses covered by the excess policy)."  (Croskey, *supra*, ¶ 8:203.)

29

coverage].” The schedules of primary and umbrella coverage identify the underlying policies to which the Continental and Columbia policies are specifically in excess; for example, policy no. RDX 030 807 62 18 references a primary policy written by INA, as well as three umbrella policies written by Lloyds and Home Insurance.

Montrose would have us conclude that Continental’s and Columbia’s policies attach immediately upon the exhaustion of the policies specifically identified in the schedule of primary and umbrella coverage. But that analysis ignores the other relevant policy provisions, including the following:

*Definition of “loss”:* Continental’s and Columbia’s policies define “loss” (as used in the indemnification provisions) as “ ‘the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable, after making deductions for all recoveries, salvages *and other insurances* (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy.’ ” (Italics added.) These policies thus define loss *in terms of* other insurance.

*“Other insurance” clauses*: The “other insurance” clauses state: “ ‘If, with respect to a loss covered hereunder, the insured has other insurance, whether on a primary, excess or contingent basis, there shall be no insurance afforded hereunder as respects such loss; provided, that if the applicable limit of liability of this policy is greater than the applicable limit of liability provided by the other insurance, this policy shall afford excess insurance over and above such other insurance in an amount sufficient to give the insured, as respects the layer of coverage afforded by this policy, a total limit of liability equal to the applicable limit of

30

liability afforded by this policy.' " This provision " 'does not apply with respect to the underlying insurance or excess insurance purchased specifically to be in excess of this policy.' " It thus expressly states that the Continental and Columbia policies shall not cover losses for which the insured has other insurance.

We caution that the foregoing discussion addresses just a few of the excess policies at issue, and thus nothing we have said should be understood to apply to *all* of the excess policies before us. To the contrary, there is tremendous variation among the relevant policies, and each must be interpreted according to its own language.[5] There may well be some policies that, as Montrose argues, are triggered by the exhaustion of only the underlying scheduled insurance for the same policy year. To demonstrate that it is entitled to elective stacking as to its entire policy portfolio, however, Montrose must show that *each* policy is susceptible of being read in this fashion. It plainly has not done so.

---

[5] We disagree with Montrose's contention that "[w]hile there are various nuances and variations in the insuring agreement for each of the Policies, these differences do not change the basic grant of coverage . . . or materially alter the determination of the proper exhaustion methodology." As we have said, there is significant diversity among the various excess policies—the relevant language of which fills approximately 90 pages of Montrose's appendix.

2. Case Law Establishes That "Other Insurance" Provisions Must Be Given Effect According to Their Terms

(a) *Community Redevelopment*

Our conclusion that (at least some of) the policies before us are excess to lower-lying policies written in both the same *and other years* is consistent with the conclusion of *Community Redevelopment*, *supra*, 50 Cal.App.4th 329. There, the insured was a developer who constructed housing complexes on improperly filled land. (*Id.* at p. 333–334.) The insured had purchased primary insurance policies from United Pacific Insurance Company (United) for policy years 1982–1984, and from State Farm Fire and Casualty Insurance Company (State Farm) for policy year 1985–1986; for policy year 1985–1986, the developer also purchased an excess policy from Scottsdale Insurance Company (Scottsdale). (*Id.* at p. 334.) When the insured was sued by homeowners for continuing property damage that spanned these policy periods, it tendered claims to all three insurers.

After State Farm's primary policy limits were exhausted, a dispute arose between United and Scottsdale as to which insurer was responsible to the developer for the remaining defense costs. United argued that Scottsdale's policy was excess to State Farm's primary policy, and thus Scottsdale's duty to defend arose as soon as the State Farm policy was exhausted. (*Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 337.) Scottsdale disagreed, urging that its insurance was excess to all other primary insurance available to the developer.

To resolve the issue, the court reviewed the language of the Scottsdale excess policy. The court noted that there was "no

32

dispute" that Scottsdale's $5 million coverage was purchased as excess to the $1 million primary policy issued by State Farm. However, "the express provisions of the [excess] policy further provide that Scottsdale's liability was also excess to 'the applicable limits of *any other underlying insurance* collectible by the [insured parties].' (Italics added.) This express description as to the scope of Scottsdale's excess coverage is entirely consistent with, and is reinforced by, other policy language dealing with Scottsdale's duty to defend and the impact of 'other insurance.' Scottsdale agreed to defend its insured provided that 'no other insurance affording a defense or indemnity against such a suit is available.' The policy also provided that the insurance afforded by the policy 'shall be excess insurance over any other valid and collectible insurance available to the [insured parties] whether or not described in the Schedule of Underlying Insurance' (which schedule listed State Farm's $1 million policy)." (*Community Redevelopment*, *supra*, 50 Cal.App.4th at p. 338.) Thus, applying "settled rules of policy construction," the court concluded that Scottsdale's exposure was excess to *all* other primary insurance available to the developer. (*Id.* at pp. 338–339; see also *Padilla Construction Co. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984 [under its plain language, excess policy was not triggered until all primary insurance was exhausted, including primary insurance written in different policy years]; *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 600 [" '[When] a policy which provides excess insurance above a stated amount of primary insurance contains provisions which make it also excess insurance above all other insurance which contributes to the

33

payment of the loss together with the specifically stated primary insurance, such clause will be given effect as written.' "].)

Montrose urges that *Community Redevelopment* is not relevant to our analysis because that case involved primary coverage and "did [not] announce any rule about a policyholder's right to access higher-lying coverage before the exhaustion of *excess* policies in different policy periods."[6] We do not agree. While Montrose is correct that the underlying layer of insurance in *Community Redevelopment* was a primary layer, rather than a lower-lying excess layer, Montrose suggests no reason why we should differently interpret *first-layer* excess policies (that is, excess policies immediately above primary policies) and *higher-level* excess policies (excess policies immediately above other excess policies). Montrose also suggests that *Community Redevelopment* is not relevant because it "had nothing to do with a policyholder's right to *indemnity* coverage," but rather addressed the duty to defend. In fact, although the specific question before the court in *Community Redevelopment* was whether the excess insurer had an obligation "to 'drop down' and provide a defense," the answer to that question depended on

---

[6] Montrose also argues, citing *Montgomery Ward & Co. v. Imperial Casualty & Indemnity Co.* (2000) 81 Cal.App.4th 356, 369 (*Montgomery Ward*), that "California courts that have been asked by insurers to expand *Community Redevelopment* beyond the contours of *primary* insurance have refused to do so." However, *Montgomery Ward* concerned the obligations of excess insurers to an insured in the context of a self-insured retention, which the court concluded was not " 'other collectible insurance with any other insurer' " within the meaning of the policy language before it (*id.* at pp. 366–367); it therefore is irrelevant to our analysis.

34

whether the excess insurer's exposure for either defense *or* indemnity was excess to *all* other lower-lying policies, or to only the lower-lying policy to which the excess policy specifically referred—the very issue before us in this case. (*Community Redevelopment*, *supra*, 50 Cal.App.4th at pp. 332, 336–339.)

> (b) <u>*Dart Industries, Inc. v. Commercial Union Ins. Co.* Does Not Compel Us to Ignore the Policies' "Other Insurance" Provisions</u>

Montrose acknowledges that many of the policies purport to be excess to "other insurance," but citing *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059 (*Dart*), Montrose urges that "other insurance" clauses are relevant only to "the specific question of how to allocate (or 'apportion') liability disputes 'among multiple insurers' *after* the policyholder is fully indemnified"—*not* to " 'the insurers' obligations to the policyholder.' " In other words, Montrose contends, " '[O]ther insurance' clauses govern the rights and obligations of insurers covering the same risk vis-à-vis one another, but do not affect a policyholder's right to recovery under those policies."

Montrose's assertion about "other insurance" clauses finds no support in *Dart*. *Dart* concerned claims made by women injured as a result of prenatal exposure to diethylstilbestrol (DES) manufactured by Dart from the 1940's through the 1960's. During some of those years, Dart was covered by a CGL policy issued by Commercial Union Insurance Company (Commercial Union), but all copies of the policy had been lost. (*Dart*, *supra*, 28 Cal.4th at pp. 1064–1065.) Commercial Union urged, among other issues, that an "other insurance" clause might reduce or extinguish its liability, and thus that Dart had to establish the terms of the lost policy's "other insurance" clause in order to

35

trigger Commercial Union's duties to defend and indemnify. One of the issues on appeal, therefore, was whether Dart's inability to prove the precise terms of the "other insurance" clause was fatal to its claim. (*Id.* at pp. 1078-1079.)

The court held that Dart's ignorance of the language of the policy's "other insurance" clause did not relieve Commercial Union of its policy obligations. The court noted that "the modern trend is to require equitable contributions on a pro rata basis from all *primary insurers* regardless of the type of 'other insurance' clause in their policies." (*Dart*, *supra*, 28 Cal.4th at p. 1080, italics added.) It was undisputed that Commercial Union was a primary insurer during the relevant time period. Thus, an "other insurance" clause—whatever its terms—was irrelevant to Commercial Union's obligation to provide *primary* coverage to its insured: " 'When multiple policies are triggered on a single claim, the insurers' liability is apportioned pursuant to the "other insurance" clauses of the policies [citation] or under the equitable doctrine of contribution [citations]. *That apportionment, however, has no bearing upon the insurers' obligations to the policyholder. . . .* The insurers' contractual obligation to the policyholder is to cover the full extent of the policyholder's liability (up to the policy limits).' [Citations.] This principle is consistent with 'the settled rule that an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains obligated to indemnify the insured for the entirety of the ensuing damage or injury.' [Citation.]" (*Ibid*, italics added.)

Montrose relies on the italicized language to suggest that references to "other insurance" in its policies are relevant only to the insurers' obligations to one another, *not* to the insurers'

36

obligations to it.  But in so urging, Montrose ignores a key difference between *Dart* and the present case—namely, that the insurer in *Dart* was a *primary* insurer, while the insurers in the present case are *excess* insurers.  The difference between primary and excess insurance in this context is material.  In *Dart*, the "other insurance" clause was held not to extinguish the insurer's duty to the insured under the relevant primary policies because such duty attached " 'when continuous or progressively deteriorating damage or injury first manifests itself' " and covered " 'the full extent of the policyholder's liability (up to the policy limits).' " (*Dart*, *supra*, 28 Cal.4th at p. 1080.)  The excess policies at issue in the present case, however, attach only after other identified insurance is exhausted, *not* immediately upon the occurrence giving rise to liability.  (Croskey, *supra*, at ¶ 8:176–8:177.)  Thus, because exhaustion of underlying insurance is an explicit prerequisite for the attachment of excess insurance—and because an "other insurance" clause may define the insurance that must be exhausted before the excess insurance attaches—*Dart*'s statement that apportionment among insurers has no bearing on the insurers' obligations to the policyholder simply does not apply in the present context.

The distinction between primary and excess policies for purposes of giving effect to "other insurance" clauses is aptly illustrated by *Carmel Development Co. v. RLI Ins. Co.* (2005) 126 Cal.App.4th 502 (*Carmel*).  That case involved excess CGL policies issued by RLI Insurance Company (RLI) and Fireman's Fund Insurance Company (Fireman's Fund).  (*Id.* at p. 506.)  After the limits of the primary policies were exhausted, a dispute arose between RLI and Fireman's Fund as to whether RLI was

37

required to contribute on an equal basis with Fireman's Fund to a settlement entered into by the insured.

The trial court held that because the two excess policies had competing "other insurance" clauses, the excess insurers had to contribute to the settlement on a pro rata basis. (*Carmel*, *supra*, 126 Cal.App.4th at p. 507.) The Court of Appeal reversed. It agreed with the trial court that both policies contained similar "other insurance" clauses, and it said it thus would uphold the trial court's decision if the "other insurance" clauses were considered in isolation. The *Carmel* court declined to read the clauses in isolation, however. It instead undertook "a broader examination of each policy to ascertain the context in which the 'other insurance' provisions appeared." (*Id.* at p. 509.)

The *Carmel* court noted that Fireman's Fund's insuring agreement promised to pay the insured " 'those sums in excess of Primary Insurance' " described in the " 'Limits of Insurance.' " In contrast, RLI's insuring agreement promised to pay the insured's "ultimate net loss in excess of . . . the applicable limits of scheduled underlying insurance . . . *plus the limits* of *any unscheduled underlying insurance . . . .*' " (*Carmel, supra*, 126 Cal.App.4th at p. 510, italics added.) Based on this language, the *Carmel* court concluded that RLI and Fireman's Fund did not place themselves in identical positions with respect to other insurance. It explained: "Fireman's Fund undertook to provide coverage immediately upon exhaustion of [the specifically identified primary insurer's] policy limits, whereas RLI obligated itself to step in only when the limits of *both* the [specifically identified primary] policy and *all other* available coverage— primary and excess—were exceeded." (*Carmel, supra*, at pp. 510–511.) Thus, "the overall intent and purpose of the two

38

policies at issue here can be discerned from their respective insuring terms read in context and in light of the entire policy in which they appear. Fireman's Fund provided coverage specifically excess to the underlying primary policy, whereas RLI was liable for claims in excess of *any* other insurance. Because the two policies did not operate at the same level of coverage, it was irrelevant that they both contained excess-only 'other insurance' clauses. As the Fireman's Fund policy limit was not exceeded by the [underlying] settlement, RLI had no duty to contribute to the indemnification of [the insured]." (*Id.* at pp. 516–517.)

*Carmel* makes clear that references to "other insurance" may play different roles in different policies. Where two (or more) policies are at the same level for the same risk (e.g., both primary or both excess) and contain conflicting "other insurance" provisions purporting to be excess over all other available insurance, courts may refuse to give effect to those provisions and, instead, require each to contribute to the costs of defense or indemnity on a pro rata basis. (*Carmel*, *supra*, 126 Cal.App.4th at p. 508.) Under other circumstances, however, "other insurance" clauses may be relevant to determining whether two policies provide the same level of coverage—and, thus, the order in which excess policies attach.[7]

---

[7] Montrose also contends that giving effect to "other insurance" provisions in the context of determining a policyholder's right to recovery "would lead to the absurd result that Montrose could not obtain coverage under *any* Policy, because each Policy purports to require Montrose to first exhaust *all* 'other valid and collectible insurance' in other policy periods." The claim is without merit. It is true, as Montrose notes, that where multiple policies contain "other insurance" clauses

39

C.  *Montrose's Public Policy Claims Are Without Merit*

Notwithstanding the foregoing, Montrose contends that there are multiple reasons why a rejection of elective stacking would be "inconsistent with sound public policy."  However, public policy is not an appropriate basis for re-writing the policy language:  As our Supreme Court has said, "[T]he pertinent policies provide what they provide.  [The insured] and the insurers were generally free to contract as they pleased.  [Citation.]  They evidently did so.  They thereby established what was 'fair' and 'just' inter se.  We may not rewrite what they themselves wrote."  (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 75.)

In any event, Montrose's public policy claims are without merit for the reasons that follow:

Montrose first urges that mandatory horizontal exhaustion obligates the policyholder to obtain coverage from policies it may not wish to access.  We do not agree that our holding in this case has the effect of "obligating" any policyholder to seek indemnification under any particular policy.  *All* we hold today is that insureds must exhaust lower layers of coverage before accessing higher layers of coverage *if the language of the excess*

purporting to be excess to one another such that honoring the clauses would deprive the insured of coverage, "the conflicting clauses will be ignored and the loss prorated among the insurers." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1304–1305.)  However, Montrose has not demonstrated either that each of the policies at issue has an "other insurance" clause, or that giving effect to the "other insurance" clauses will deprive it of coverage.

40

*policies so requires*—a result hardly inconsistent with sound public policy.

Montrose next argues that mandatory horizontal exhaustion penalizes policyholders for their "prudent decision" to purchase additional coverage. Not so. Horizontal exhaustion dictates only the *sequence* in which policies are accessed, not the total coverage available to the insured.[8] There is nothing unfair about requiring an insured to access policies in the manner their provisions dictate. (E.g., *Continental, supra*, 55 Cal.4th at p. 199 [in allocating losses across multiple policies, court is "constrained by the language of the applicable policies," even if another allocation scheme "would be more fair and equitable"].)

Montrose argues finally that mandatory horizontal exhaustion is "unworkable in practice" because of the complexity of its coverage portfolio. We do not doubt that allocating more than $200 million in liability across more than 100 policies covering nearly 25 years is likely to be a complicated process. That complexity, however, is not relevant to our analysis, as we cannot, in the service of expediency, impose obligations that are inconsistent with the terms of the contracts Montrose itself negotiated.

D.    *Conclusion:  The Trial Court Properly Denied Montrose's Motion for Summary Adjudication of the 32nd Cause of Action*

Having concluded that the trial court properly rejected Montrose's "elective stacking" approach, we now consider the

---

[8]    Indeed, Montrose concedes that the hundreds of millions of dollars of excess coverage the policies at issue collectively provide "should be sufficient to fully indemnify Montrose's liability incurred in *U.S. v. Montrose*."

41

effect of this conclusion on Montrose's motion for summary adjudication of the 32nd cause of action.

To reiterate, the 32nd cause of action sought a declaration that "a. In order to seek indemnification under the Defendant Insurers' excess policies, Montrose need only establish that its liabilities are sufficient to exhaust the underlying policy(ies) in the *same policy period*, and is not required to establish that all policies insuring Montrose in *every* policy period (including policies issued to cover different time periods both before and after the policy period insured by the targeted policy) with limits of liability less than the attachment point of the targeted policy, have been exhausted; and [¶] b. Montrose may select the manner in which [to] allocate its liabilities across the policy(ies) covering such losses."

To be entitled to summary adjudication of the 32nd cause of action, Montrose must demonstrate that the judicial declaration it sought applies not just to *some* of the excess policies, but to *all* of them. For the reasons discussed, while such a declaration may be appropriate with respect to some of the policies—an issue we do not reach—such broad relief manifestly could not apply to all of them. Therefore, the trial court did not err in denying Montrose's motion for summary adjudication of the 32nd cause of action.[9]

---

[9] The Travelers insurers, joined by the Continental insurers, urge that Montrose's request for summary adjudication is improper because it sought a ruling that "would excuse it from making the required showing for exhaustion" under California law: "Specifically, Montrose sought a declaration that, in order to seek indemnification under the defendant insurers' excess policies, Montrose 'need only establish that its liabilities *are sufficient to exhaust*' the insurance underlying the excess

Having concluded that the trial court properly denied Montrose's motion for summary adjudication of the 32nd cause of action, we readily conclude that the court properly granted the insurer's cross-motion for summary adjudication of that cause of action. Montrose's and the Continental insurers' competing motions for summary adjudication of the 32nd cause of action were mirror images of one another. Because Montrose was not entitled to the declaratory relief it sought *as a matter of law,* summary adjudication of the 32nd cause of action in favor of the Continental insurers was warranted.

## III.

## The Present Record Does Not Support a Universal "Horizontal Exhaustion" Approach; Thus, the Trial Court Erred in Granting the Insurers' Motion on the Issue of Duty

We now reach the final issue raised in this writ proceeding: whether the Continental insurers were entitled to summary adjudication on the issue of duty. To repeat, the Continental insurers sought a declaration that: "All underlying policy limits across the years of continuing damage must be exhausted by payment of covered claims before any of the Insurers' excess policies ha[s] a duty to pay covered claims."

As we have said, California law requires that insurance contracts be interpreted according to their terms, and there is tremendous variation among the terms of the excess policies at

---

policy(ies) it is targeting, not that Montrose has *actually* exhausted that underlying insurance or even that the terms of the underlying insurance would cover Montrose's liabilities." Because we have concluded for other reasons that Montrose is not entitled to summary adjudication, we need not reach this issue.

issue in this matter.  Further, although the parties have stipulated as to some of the language of the relevant policies, they did not provide the trial court, and have not provided this court, with all of the policy language or with copies of the policies themselves.  The absence of these policies makes it impossible for us to " 'interpret [policy] language *in context*, with regard to its intended function in the policy.'  [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc*. (2014) 59 Cal.4th 277, 288, italics added.)

Additionally, some of the policies " 'follow form' "—i.e., incorporate the provisions of the immediately underlying policies (*Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, 967)—but the insurers have not provided us with all of the underlying policies or, indeed, made clear which policies apply in each policy year.  For example, American Centennial policy no. CC-00-76-47 provides:  "Except as may be inconsistent with this Policy, the coverage provided by this Policy *shall follow the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this Policy*, including any change by endorsements."  (Italics added.)  We cannot determine from the information provided, however, the "underlying insurance" to which this policy refers.

For these reasons, we cannot conclude that *each* of the more than 115 policies at issue requires "horizontal exhaustion" of the underlying policy layers for each policy year.  Accordingly, the Continental insurers were not entitled to summary adjudication on the issue of duty.

44

## DISPOSITION

The petition for writ of mandate is granted in part and denied in part. The respondent superior court is directed to vacate the portion of its order granting the Continental insurers' motion for summary adjudication on the issue of duty, and to enter a new and different order denying their cross-motion for summary adjudication on the issue of duty; in all other respects (and specifically insofar as it challenges the court's summary adjudication of the 32nd cause of action), the writ petition is denied. The cause is remanded to the respondent superior court for further proceedings consistent with this opinion. The parties shall bear their own costs in this proceeding. (Cal. Rules of Court, rule 8.493.)

**CERTIFIED FOR PUBLICATION**

EDMON, P. J.

We concur:

ALDRICH, J. *

LAVIN, J.

---

\*       Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

45